IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT LEE SIMMONS,

        Plaintiff,

    v.

THE CITY OF CHICAGO,
ILLINOIS, a Municipal
Corporation; CHICAGO POLICE
SARGEANT JOHN PIECHOCKI
#1349; CHICAGO POLICE
OFFICERS MARK D'AMATO #6150,
MARVIN OTTEN #2773, and
TIMOTHY MacFARLANE #13015,

        Defendants.

Case No. 14 C 9087

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Simmons's Motion for Summary Judgment on his 42 U.S.C. § 1983 unlawful detention claim ("the Motion") [ECF No. 78] is granted in part and denied in part.

The Court denies the Motion except as to Defendant Piechocki's liability for unlawfully and unreasonably ordering Plaintiff's arrest without probable cause. However, genuine disputes of material fact remain as to whether any Defendant Officers could reasonably have foreseen Plaintiff's protracted and unreasonable detention following his arrest. Before summarizing the undisputed facts, the Court briefly addresses

the nature of the parties' briefing and why it will decide Defendants' Motion for Summary Judgment separately.

Plaintiff filed the Motion along with a Local Rule 56.1(a)(3) Statement of Uncontested Material Facts [ECF No. 79] (the "Plaintiff's Statement"). Defendants responded to Plaintiff's Statement [ECF No. 84] and submitted a "Response in Opposition to Plaintiff's Motion for Summary Judgment and Memorandum in Support of Defendants' Cross Motion for Summary Judgment" [ECF No. 85] (the "Response"]. This filing was accompanied by a Local Rule 56.1(b)(3) Statement of Uncontested Additional Facts [ECF No. 86] (the "Defendants' Statement"), but no Local Rule 56.1(a)(3) Statement of Uncontested Material Facts. Plaintiff then submitted a Reply Brief in support of Plaintiff's Motion [ECF No. 91] and responded to Defendants' Statement [ECF No. 92].

It was only after these filings, which consummated the briefing on Plaintiff's Motion, that Defendants filed their "Joint Partial Motion for Summary Judgment" [ECF No. 93], incorporating their Response filed almost two weeks prior and attaching a Rule 56.1(a)(3) Statement [ECF No. 94]. Plaintiff then responded, contesting some facts and admitting others. These filings introduced a host of facts surplus to those

forming the basis of Plaintiff's Motion on his unlawful detention claim and the associated briefing.

Local Rule 56.1 provides *inter alia* that a moving party shall serve and file "[w]*ith each motion for summary judgment*" a statement of uncontested material facts. N.D. Ill. L.R. 56.1(a) (emphasis added). A district court has broad discretion to require strict compliance with the rule. *See, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004). As such, the Court treats the relevant portions of Defendants' Response as a brief in opposition to Plaintiff's Motion. In a separate opinion, it decides Defendants' "Joint Partial Motion for Summary Judgment" with full consideration of any relevant arguments in the Response as well as the briefs and fact statements filed after Plaintiff's Motion was fully briefed.

## I.  <u>FACTUAL BACKGROUND</u>

For purposes of this Motion, the following facts are viewed in the light most favorable to Defendants (the non-movants), and all reasonable inferences are drawn in their favor. *See, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

On March 9, 2014, Defendant D'Amato obtained a search warrant for a single-family residence located at 2725 East 92nd

Street in Chicago, Illinois ("the residence"). (ECF No. 84 ¶ 5.) Its target was an African-American male nicknamed "Sunny," approximately 45-50 years in age, 5'5"-5'8" in height, weighing 140-160 pounds, and with brown eyes, a dark complexion, and black hair worn long and wavy. (*Id.* ¶ 6.) The warrant was procured with the assistance of a confidential informant, who claimed to have purchased narcotics from "Sunny" out of the basement door of the residence. (ECF No. 92 ¶ 4.)

Plaintiff Simmons is an African-American male of medium-brown complexion. (ECF No. 92, Ex. F ("Arrest Rep."), p.1.) On March 9, 2014, he was 67 years old, 5'11" tall, 165 pounds, with brown eyes and short hair – either "buzzed or bald." (ECF No. 84 ¶ 7; MacFarlane Tr. 42:17-22; Arrest Rep. at p.1.) He lived at 222 West 106th Place in Chicago, Illinois. (*Id.*) Simmons has never lived at 2725 East 92nd Street but was visiting that address on March 9, 2014, because it is the home of his brother, James Garland. (*Id.* ¶ 9.) Simmons suffers from cerebral palsy and has a noticeable speech disorder. (*Id.* ¶ 8; ECF. No. 84 ¶ 8; *see generally* Defs.' St., Ex. A.)

At approximately 8:45 p.m. on March 9, 2014, Defendants D'Amato, Otten, MacFarlane, and Piechocki (the "Defendant Officers") arrived at the residence to execute the search warrant, accompanied by Officer Thomas Derouin. (ECF No. 84

¶ 11.)  Defendant Officers forced open the rear door of the house and entered the basement one at a time, finding Simmons sitting at a table in the basement kitchen.  (*Id.* ¶¶ 12-13.) Simmons complied with directives to put his hands up and did not do anything perceived as threatening or dangerous.  (*Id.* ¶¶ 14-16.)  D'Amato initially detained Simmons on the floor, where he lay face down, at about the same time that Piechocki entered the basement.  (*Id.* ¶ 20.)

While Simmons was detained and lying on the floor, Officer Derouin proceeded to the stairwell and began to shout at an individual located upstairs.  (ECF No. 84 ¶¶ 21, 23; *see also, e.g.,* D'Amato Tr. 63:12-66:4.)  Someone from upstairs then shot Officer Derouin, who fell into the basement kitchen wounded and collapsed near Simmons.  (ECF No. 84 ¶¶ 23, 24.)  Defendants Otten and MacFarlane had moved into a separate room in the basement, albeit within several steps of Simmons, when they heard the shot.  (ECF No. 92 ¶¶ 6-10.)  Otten assisted Derouin out of the house and into a police vehicle in the alley; he had no further involvement in Simmons's detention or arrest.  (*Id.* ¶¶ 14-17.)

Within a minute of hearing the gunshot, MacFarlane handcuffed Simmons, who was still lying on the floor.  (ECF No. 84 ¶ 25; *see,* Pl.'s St., Ex. H, 55:8-10.)  D'Amato played no

further role in Simmons's detention or arrest. (ECF No. 92 ¶¶ 22, 23.) At his deposition, MacFarlane offered the following justifications for handcuffing Simmons: Simmons might have been involved in firing a gun at Officer Derouin; Simmons could have been "Sunny," the target of the search warrant; and Simmons was then within reach of Officer Derouin's sidearm. (*See,* ECF No. 84 ¶ 26; MacFarlane Tr. 83:19-84:11; ECF No. 92 ¶ 13.)

MacFarlane admitted that he never saw Simmons on the basement stairwell, on the first floor, or with James Garland, who was ultimately charged with shooting Officer Derouin. (ECF No. 84 ¶¶ 28-29, 40.) At no point did MacFarlane see anything, including weapons, in Simmons's hands. (*Id.* ¶ 30.) Simmons did not disobey any police commands prior to being handcuffed, nor did he resist or fail to cooperate at any time. (*Id.* ¶ 32.) When Simmons was lying on the basement floor in handcuffs, MacFarlane asked him whether he knew who shot the gun; Simmons replied that he did not. (*Id.* ¶ 31.) Prior to handcuffing Simmons, MacFarlane did not check his identification, ask his name, or inquire whether he lived at that address, went by the name "Sunny," or knew "Sunny." (ECF No. 84 ¶ 34.)

Officers unknown subsequently removed Simmons from the residence and transported him to the Fifth District police station. (ECF No. 84 ¶ 44.) MacFarlane played no role in that

decision or in executing it. (ECF No. 92 ¶¶ 18-21.) Rather, Defendant Piechocki ordered that Simmons, along with five other civilians found at the residence, be taken to the police station because they were "potential suspects to the attempted murder, aggravated battery, possession of the handgun [found in the upstairs living room], and narcotics sales from the home." (Defs.' St., Ex. H, ¶ 14; ECF No. 92 ¶ 32; Arrest Rep. at p.1.) Specifically, he testified that Simmons could have been "Sunny," the target of the search warrant. (Piechocki Tr. 62:9-14.) Piechocki testified that Simmons, "[w]hen he was being escorted to one of the transport cars," directly informed Piechocki that he had defecated on himself. (Piechocki Tr. 62:15-22.)

Defendant Piechocki is the only Defendant who saw narcotics at the scene, and he noticed the small bag of crack cocaine (street value of about $10) after deciding to transport all the civilians to the police station. (ECF No. 84 ¶¶ 39, 41, 43; Pl.'s St., Ex. G, 77:10-78:12; Pl.'s St., Ex. H, 89:15-22.) Piechocki had no further contact with the civilians, including Simmons. (ECF No. 92 ¶¶ 33-35.) An outside unit completed the search pursuant to the warrant at approximately 3:00 a.m. on March 10, 2014. (*Id.* ¶ 36.)

Simmons remained at the police station for approximately seventeen (17) hours until his release at 1:45 p.m. on March 10,

2014. (ECF No. 84 ¶ 47; ECF No. 92 ¶ 36.) Simmons's arrest report recites a charge of possession of a controlled substance, but no criminal complaints were ever filed against him. (ECF No. 84 ¶ 37; ECF No. 92 ¶ 37.) The arrest report was created for administrative purposes, with Otten and D'Amato listed as arresting officers only because they were affiants of the warrant. (ECF No. 92 ¶¶ 38-39.) None of the Defendant Officers physically detained Simmons at the police station. (*Id.* ¶ 40.) Jurisdiction over Simmons's custody eventually passed from Piechocki to the detectives investigating the shooting of Officer Derouin. (*Id.* ¶¶ 34-35.)

Just before his release, at around 11:45 a.m. on March 10, Simmons gave a voluntary statement to Detective Pat Ford and ASA George Cannellis. (ECF No. 92 ¶ 1.) At some point prior to giving his statement, Simmons was informed that he was free to leave. (*Id.* ¶¶ 2, 3.) However, he was in "lockup," meaning "in a cell" and "under arrest," for approximately 14 hours - until at least 10:36 a.m. on March 10 when he was transferred "Out Of Lockup for A/S Interviews." (Ford Tr. 42:15-43:1; Pl.'s St., Ex. D, at FCRL 000355.) At his deposition, Detective Ford claimed that Simmons remained under arrest because of possession of a controlled substance and because his role in the shooting of Officer Derouin was unclear. (Ford Tr. 43:2-17.) The

General Progress Report, which Chicago police detectives prepared sometime on March 9, reported Simmons's address as 222 West 106th Place. (ECF No. 84 ¶ 45 & Ex. I.) The record before the Court is silent on when, if ever, Simmons was read *Miranda* warnings.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007).  The Court does not make credibility determinations as to whose story is more believable. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011).  It must consider only evidence that can be "presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

The party seeking summary judgment bears the initial burden of showing that there is no genuine dispute and that it is

entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine,* 605 F.3d 451, 460 (7th Cir. 2010); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If this burden is met, then the adverse party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256.

## III.  ANALYSIS

Simmons argues that Defendants violated his civil rights, first, when Officer D'Amato detained him at the residence; second, when Officer MacFarlane handcuffed him there; and third, when he was removed from the residence in handcuffs, transported to the police station, and held behind bars overnight for more than fourteen (14) hours. To the extent any of the individual Defendants did not physically detain or arrest Simmons or order his overnight stint behind bars, Plaintiff claims they are liable on ordinary tort principles of foreseeability. (*See, e.g.,* Pl.'s Reply at 10-12.)

In response, Defendants argue that Simmons's unlawful detention claim fails for the following reasons: first, Defendant Officers Otten, D'Amato, and MacFarlane had no personal involvement in the decision to remove Simmons from the residence or to hold him at the police station; second, Defendant Piechocki had no involvement in the decision to hold

Simmons at the police station for so long; and third, Plaintiff's arrest and entire detention were reasonable. Alternatively, Defendant Officers argue that they are entitled to qualified immunity.

### A. Plaintiff's Initial Detention at the Residence

Whether Simmons is entitled to summary judgment on his unlawful detention claim with respect to his initial detention at the residence depends on whether Defendant D'Amato acted within constitutional strictures in approaching Simmons with his gun drawn, demanding that he raise his hands, and detaining him on the floor of the basement. If there was no constitutional violation, then none of the other Defendant Officers can be liable (and neither can Defendant City of Chicago).

Officers executing a search warrant are permitted, while a proper search is conducted, to detain occupants of the premises without probable cause or particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers. *Michigan v. Summers,* 452 U.S. 692, 702–705 (1981); *Muehler v. Mena,* 544 U.S. 93, 98 (2005). An individual subjected to a *Summers* detention need not own or even reside at the premises; it is enough that he or she is present as a visitor when officers execute the warrant at a residence "that a neutral magistrate had found probable cause to believe

contained evidence of illegal . . . activities." *See, U.S. v. Pace,* 898 F.2d 1218, 1239 (7th Cir. 1990) (reasoning that the defendants' connections as visitors "to the condominium gave the officers 'an easily identifiable and certain basis'" for detaining them during the search) (quoting *Summers,* 452 U.S. at 703-04); *cf. Bailey v. U.S.,* 133 S.Ct. 1031, 1043 (2013) (Scalia, J., concurring) (defining "occupants" as "persons within 'the immediate vicinity of the premises to be searched'").

Therefore, there is ample evidence supporting a jury finding that Officer D'Amato's initial detention of Simmons in the basement of the residence was reasonable. As such, the Court denies Plaintiff's Motion as to his initial detention.

## B. The Handcuffing and Further Detention Of Plaintiff at the Residence

Whether Simmons is entitled to summary judgment on his unlawful detention claim with respect to his handcuffing and further detention at the residence turns on the reasonableness of, first, D'Amato's brief continued detention of Simmons after Officer Derouin was shot; and second, MacFarlane's subsequent decision to handcuff and then continue detaining Simmons for several minutes. If both officers acted reasonably, then neither they nor the other Defendants can be liable.

The facts presented to the Court indicate that, within a minute or so of the shooting of Officer Derouin, Defendant MacFarlane assumed custody of Simmons from Defendant D'Amato and handcuffed him for, among other reasons, officer safety. MacFarlane continued to detain Simmons for several minutes until the scene was secure and unknown officers relieved him, and Piechocki later ordered Simmons's removal in handcuffs to the police station. Analyzing the reasonableness of Simmons's continued detention at the residence might proceed down two paths.

The first extends the *Summers* rationale to authorize his detention (by D'Amato and then MacFarlane) even after the shooting of Officer Derouin. The Court notes that use of handcuffs is reasonable to effectuate a *Summers* seizure when "the governmental interest in minimizing the risk of harm to both officers and occupants [is] at its maximum." *Muehler,* 544 U.S. at 93-94. Such was the government's interest immediately after the shooting of Officer Derouin. Further, the Seventh Circuit has analogized a detention under *Summers* to a *Terry* stop. *See, U.S. v. Burns,* 37 F.3d 276, 281 (7th Cir. 1995). As such, the latitude afforded officers conducting a *Terry* stop "to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course

of the stop," *U.S. v. Hensley,* 469 U.S. 221, 235 (1985), would seem to apply to the situation here. *See, Graham v. Connor,* 490 U.S. 386, 396 (1989) (permitting "some degree of physical coercion" in making an investigatory stop). Thus, to the extent the search warrant was still being executed despite the shooting and during Simmons's handcuffing and continued detention at the residence, he was reasonably detained under *Summers* without triggering the legal framework governing arrests.

Under the second reading, the shooting of Officer Derouin immediately suspended the search pursuant to the warrant, and the residence instead became an active crime scene such that *Summers* cannot bless Simmons's continued detention there. The Court harbors doubts about keying reasonableness to such an artificial on/off switch where police are presented with the kind of dangerous, fluid scenario that confronted Defendant Officers at the residence during the chaos immediately following the shooting. But it nonetheless undertakes a non-*Summers* analysis in light of certain undisputed facts presented to the Court that suggest suspension of the search (*i.e.,* a different group of officers had to complete the search around 3:00 a.m. on March 10, 2014, while Simmons was in lockup). Suspending the categorical *Summers* rule, the Court must determine whether it was reasonable for D'Amato to detain Simmons after the shooting

and for MacFarlane then to handcuff and continue detaining him, and whether the force used to conduct Simmons's seizure transformed it into an arrest for which probable cause was required.

The officers could have had individualized suspicion under *Terry v. Ohio,* 392 U.S. 1 (1968), to detain and handcuff Simmons immediately after the shooting. The touchstone of reasonable suspicion supporting a soi-disant *Terry* stop is whether "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27 (citations omitted). Here, immediately after Officer Derouin's shooting, his gun came to rest within a few feet of Simmons. Although no one disputes that Simmons had theretofore posed no threat to police, a jury could certainly find it reasonable in these circumstances to believe that anyone found in the house was potentially dangerous to police and that leaving them unrestrained near weapons posed a threat to officer safety. And, of course, Defendant MacFarlane did not need probable cause to handcuff Simmons, because handcuffing alone does not *ipso facto* signify an arrest. Particularly in the Seventh Circuit, the permissible scope of a *Terry* stop may include the use of handcuffs. *See, Jewett v. Anders,* 521 F.3d

818, 826-827 (7th Cir. 2008); U.*S. v. Stewart,* 388 F.3d 1079, 1084 (citing *U.S. v. Vega,* 72 F.3d 507, 515 (7th Cir. 1995)).

Alternatively, the officers might rely on *Illinois v. Lidster,* 540 U.S. 419 (2004), to justify a suspicionless detention of Simmons. In judging the reasonableness of a suspicionless seizure, courts must "look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Lidster,* 540 U.S. at 426-27 (quoting *Brown v. Texas,* 443 U.S. 47, 50 (1979)). First, the public concerns served by Simmons's seizure were grave. Officer Derouin had just been shot while executing the search warrant for the residence, and testimony (undisputed for the purposes of this Motion) establishes that Derouin's sidearm came to rest within a few feet of Simmons. A jury hearing the evidence presented could clearly find that this fluid and still-dangerous situation favored detaining Simmons at the residence immediately after the shooting.

Second, *Lidster* establishes that detention of non-suspect potential material witnesses for a few minutes sufficiently advances the public interest, even where officers have little reason to believe that any individual detainee has specific information. *See, Lidster,* 540 U.S. at 427 (authorizing

roadside motorist stops "to obtain information from drivers, some of whom might well have been in the vicinity of the crime at the time it occurred"). Here, by contrast, Simmons was unquestionably near the scene of Derouin's shooting at the time it occurred, and he was far more likely to have specific information than the individuals detained in *Lidster*. Therefore, detaining Simmons at the scene for several minutes significantly advanced the public's interest, and a jury could clearly find on the evidence presented that the second factor weighs in favor of D'Amato and MacFarlane.

Third, the severity of the interference with Simmons's individual liberty was slight, particularly when viewed against the backdrop of the situation that would have obtained *in the absence of the shooting*. The duration of his minutes-long detention at the hands of D'Amato and MacFarlane strikes the Court as insignificant, keeping in mind that Simmons could have been detained at the residence under *Summers* until the full search was completed. Thus, continuing to detain Simmons at the residence for several minutes after Officer Derouin's shooting did not significantly increase, if at all, the temporal interference with Simmons's liberty relative to the germane baseline – an unimpeded search of the residence. With respect to the intrusion on liberty represented by Defendant

MacFarlane's use of handcuffs, the Supreme Court has declared that "the need to detain multiple occupants ma[kes] the use of handcuffs all the more reasonable." *Muehler,* 544 U.S. at 93 (citation omitted). This was the case here, as another civilian was found in the basement and four others on the first floor of the residence. Even assuming that the jury adjudged the use of handcuffs to be an onerous incursion on Simmons's liberty, this third factor in Simmons's favor could not supersede the other two (on which the jury could plainly find in Defendants' favor).

Finally, irrespective of whether Simmons's further detention falls under *Terry* or *Lidster,* the application of handcuffs to Simmons did not as a matter of law rise to the level of an arrest such that MacFarlane needed probable cause. As mentioned earlier, a *Terry* stop in the Seventh Circuit carries with it implicit authority to apply handcuffs. And, with respect to *Lidster* detentions, the general rule applies: whether a seizure constitutes an arrest depends on "whether the surrounding circumstances would support an officer's legitimate fear for personal safety." *Matz v. Klotka,* 769 F.3d 517, 526 (7th Cir. 2014). In this case, the officers had a legitimate fear for personal safety based on the shooting of Officer Derouin and the ultimate resting place of his sidearm, and thus the use of handcuffs on Simmons at that time did not amount to

an arrest requiring probable cause. Indeed, the "swiftly developing situation" within the residence immediately after the shooting and before the residence and its occupants were secured, counsels against a finding that Simmons's handcuffing elevated his detention to an arrest. *U.S. v. Sharpe,* 470 U.S. 675, 686 (1985).

Therefore, Simmons's post-shooting detention and subsequent handcuffing (whether understood as part of the search warrant detention under *Summers* or a new seizure) were reasonable and did not give rise to a custodial arrest requiring probable cause. Because substantial undisputed evidence supports a finding that Defendants D'Amato and MacFarlane acted within constitutional limits, Plaintiff cannot show that he is entitled to judgment as a matter of law. As such, the Court denies Plaintiff's Motion in relevant part.

### C. Plaintiff's Removal From the Residence, Arrest, and Lengthy Detention at the Police Station

The final issue facing the Court is whether Simmons is entitled to summary judgment on the balance of his unlawful detention claim: his transport in handcuffs to the police station and protracted confinement there for nearly 14 hours.

Simmons contends that his detention cannot be justified by his presence at the residence during the shooting of Officer Derouin, the prospect that he was "Sunny," or any individualized

suspicion that he possessed narcotics. Despite not contesting that only Piechocki ordered his removal to the police station, Simmons argues that the other Defendant Officers are equally responsible under foreseeability principles derived from the law of torts and applicable to a § 1983 action. He further contends that none of the Defendant Officers are entitled to qualified immunity.

In response, Defendants note that Otten, D'Amato, and MacFarlane had no involvement in the decision to remove Plaintiff from the residence or in his protracted stay at the police station. With respect to Piechocki, Defendants argue that his direction to remit Simmons to the police station was reasonable as a *Terry* investigation based on reasonable suspicion that Simmons was "Sunny" or possessed illegal narcotics, as a formal arrest predicated on probable cause that Simmons was "Sunny," or as a protracted detention of a non-suspect material witness under *Lidster* and *Golla v. City of Bossier City,* 687 F.Supp.2d 645 (W.D. La. 2009). Defendants stress that Piechocki was not involved in the decision to hold Simmons behind bars during the ongoing investigation into "Sunny" and the shooting of Officer Derouin, because jurisdiction over these decisions rested with the investigating detectives. They finally assert qualified immunity as to all

Defendant Officers. (Defendants also argue that Simmons's claims against MacFarlane and Piechocki are time-barred because of Simmons's failure to timely amend his Complaint to add them as Defendants. The Court rejected this same argument in its October 19, 2016 ruling on Defendants' Motion to Dismiss, and again on November 30, 2016 after MacFarlane and Piechocki filed a Motion for Reconsideration of the same. As such, the Court will not entertain this argument a third time.)

Broadly put, this aspect of Plaintiff's Motion presents the question whether police can constitutionally arrest and detain behind bars a docile and unthreatening individual based on the most tenuous of connections to controlled substance possession, a police shooting, or a search warrant's physical description of a drug dealer. This Court answers, on the basis of the facts presented, that no reasonable jury could find such an individual's arrest and prolonged subsequent detention reasonable on the grounds of his mere presence in the same building where the shooting occurred, the drugs were discovered, and at least four other individuals with more robust connections to both were found. The outcome does not change because such an individual matches the most generic characteristics of the relevant search warrant's physical description, approximates a few more specific ones, and differs profoundly from the rest.

### *1. The Character of State Action*

The Court finds it prudent first to classify the character of state action according to the undisputed facts. The lodestar of an arrest is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Fox v. Hayes,* 600 F.3d 819, 833 (7th Cir. 2010) (internal quotation marks omitted). As explained above, Simmons was not under arrest simply by virtue of being handcuffed at the residence during the fluid situation immediately after the shooting and before the residence was secured. Similarly, no reasonable jury could find that Simmons was *not* under arrest while in lockup at the police station, where he was held — with the exception of being removed for fingerprinting — until nearly 11:00 a.m. on March 10, 2014. For this 14-hour arrest, there must have been probable cause.

However, precedent somewhat muddies the waters on the status of Simmons's removal from the residence and transport via squad car. Some circumscribed authority exists for Defendants' notion that a suspect's handcuffing and detention in a squad car do not necessarily amount to an arrest. *See, e.g., Vega,* 72 F.3d at 515 (classifying a 60-minute detention in a squad car as "the outer boundaries of a permissible *Terry* stop"); *Stewart,* 388 F.3d at 1084-85 (holding that officers engaged in a *Terry*

stop when they handcuffed and placed in the back of a squad car for 10 minutes a suspect who matched the description, called in to police an hour earlier, of a recent bank robber); *U.S. v. Vanichromanee,* 742 F.2d 340, 344 (7th Cir. 1984) (holding that detaining three suspects in a parking garage and moving them to an apartment was not an arrest but merely "maintain[ing] the status quo momentarily"); *Pike v. Foster,* No. 12-cv-00094, 2016 WL 537940, at *6-7 (N.D. Ill. Feb. 11, 2016) (authorizing as part of a *Terry* investigation of a suspected violent criminal his handcuffing and detention in a squad car, and his transport back to the crime scene for a "show-up identification").

In each of these instances deemed to constitute a *Terry* stop as opposed to an arrest, the suspect was *not* being transported to the police station. The *Stewart* court identified a further "common" theme in such cases — "the officers' reasonable belief that the suspect was potentially dangerous." *Stewart,* 388 F.3d at 1085. Even if it was reasonable to believe that Simmons fit the description of "Sunny," which the Court denies below, it was unreasonable to believe that he was potentially dangerous in light of his clear lack of involvement in the shooting and his compliance with officers' commands throughout the entire ordeal. Further, the night's events caused him to defecate on himself before his transport to the

police station – hardly the trademark of a dangerous criminal. In light of the undisputed facts, the Court finds unreasonable any inference that Simmons represented a danger to police or others at the time of Piechocki's order. The circumstances attending Simmons's removal from the residence (after police secured the premises and its occupants) do not support a finding of a *Terry* stop. As a matter of law on these facts, Piechocki ordered Simmons's formal arrest when he directed his removal from the residence and transport in handcuffs to the police station.

Defendants make several arguments that, conceptually, could still apply beyond this finding that Piechocki ordered Simmons arrest. Therefore, the Court spills some ink to address them here. Essentially, Defendants argue that Simmons's forced detention at the police station (most of which occurred behind bars) was not necessarily an arrest. They assert a patchwork of theories in this regard.

First, Defendants argue that Simmons, all through the night at the police station, "was being held pursuant to the search warrant, and the search was being delayed as a result of Officer Derouin being shot." (Response at 21.) This argument would be laughable if the circumstance it is offered to explain — forcibly holding behind bars an elderly man with cerebral palsy

— were not so lugubrious.  Supreme Court precedent puts paid to Defendants' frivolous argument.  For example, *Bailey* makes clear that the *Summers* rule is spatially constrained and limited to the immediate vicinity of the premises to be searched. *See, Bailey,* 133 S.Ct. at 1042-43.  Thus, Defendants' argument for extending *Summers* detentions this far beyond the premises to be searched fails *ab initio* based on *Bailey*.

Next, Defendants claim that "Plaintiff became a cooperating witness and was at the station voluntarily of his own free will."  (Response at 21; *see also id.* at 20.)  The exhibits submitted in support of *both parties'* fact statements negate any real significance to Simmons's unlawful detention claim of his eventual voluntary statement.  His arrest report undeniably indicates that he was "in lockup" until 10:43 a.m. on March 10, which by Detective Ford's own admission meant he was *ex vi termini* "under arrest" until at least that time.  The difference between a 17-hour detention and a 14-hour detention is not meaningful from the perspective of liability for Simmons's alleged unconstitutional injury (and goes only to damages).

In one final avoidance tactic, Defendants seek to color Simmons's protracted stay in custody as something other than an arrest by invoking *Lidster* and one bit of persuasive authority, *Golla v. City of Bossier City*.  These cases make it perfectly

constitutional, their argument apparently goes, to detain a non-suspect material witness in lockup at the police station for 14 hours. This Court disagrees with Defendants' impoverished analogical reasoning.

### a. *Lidster*

In *Lidster,* as mentioned above, the Supreme Court authorized the brief (*i.e.,* "a very few minutes at most") detention of motorists in their cars to seek information about a fatal hit-and-run accident that had recently occurred on that stretch of highway. *See, Lidster,* 540 U.S. at 427-428. As it did with respect to Simmons's detention at the residence, the Court again examines the three *Brown* factors the Court applied in *Lidster*.

First, the public concern served by Simmons's transport to and forced detention at the police station was analogous to that in *Lidster*: gathering information about a recently committed (albeit, in Derouin's case, not fatal) crime. It was less grave than that which justified Simmons's initial detention at the residence when officers' lives were at risk. Once the premises were secure and all officers safe, the public interest in seizing Simmons decreased to a level approaching that in *Lidster.*

Second, the degree to which Simmons's seizure advanced the public interest is moderate. He was present at the scene as a material witness, but had already told MacFarlane while handcuffed and before his removal from the residence that he did not know who shot Officer Derouin. Further, relative to the four other arrested civilians who were present on the first floor (where Piechocki and others found a handgun), Simmons was a poor eyewitness. (It is worth noting, both for *Lidster* purposes and further to the qualified immunity analysis below, that Piechocki admitted to seeing Simmons lying on the floor and detained when Officer Derouin was shot.)

Third, the intrusion on Simmons's liberty falls on the most invasive end of the spectrum: in contrast to a motorist remaining in her car for a few minutes or Simmons remaining detained at the residence during the search, here Simmons was removed from the premises to the police station and held there for over a dozen hours. It is difficult to imagine a more onerous incursion on one's liberty. Thus, the public interest attending Simmons's seizure here is on par with *Lidster* (and attenuated compared to that served by his initial seizure), seizing him only modestly served that public interest, and the incursion on his liberty was severe. What happened to Simmons

here was not a brief and unobtrusive information-seeking investigatory detention permissible under *Lidster*.

### b. *Golla*

*Golla,* on the facts before the Court, is even less helpful to Defendants. In that case, the Golla family was visiting Bossier City "to stay at the home of Mrs. Golla's brother, Michael James McDaniel." *Golla,* 687 F.Supp.2d at 651. There, the Gollas gathered in the McDaniels' garage for tequila shots. The party atmosphere quickly soured when Mr. McDaniel began talking of suicide. Officers arriving at the scene were confronted by Mrs. Golla, who told them that her husband was in the garage trying to de-escalate the situation with Mr. McDaniel. The officers entered the garage, Mr. McDaniel rushed for his shotgun, and one of the officers then used deadly force. Mr. Golla was the only other witness to the shooting — and a direct eyewitness at that. *Golla,* 687 F.Supp.2d at 658.

Because Mr. Golla was "intoxicated and belligerent," he was handcuffed and removed from the garage. Police then began to secure the scene and removed Mr. Golla to the police station, where they immediately took off his handcuffs and placed him in an interview room. One Detective McWilliams attempted to take his statement, but Mr. Golla was passed out in the interview room. Upset that he was woken up, Mr. Golla then "purportedly

became verbally and physically threatening, and came across Detective McWilliam[s's] desk with his right hand raised." *Golla,* 687 F.Supp.2d at 652. He was then handcuffed again. About three hours after his arrival at the police station, Mr. Golla hurled a chair through the window of the interview room and crawled through the broken window. *It was only then* that he was "*arrested* for simple criminal damage to property, and *booked* into the Bossier City Jail." *Golla,* 687 F.Supp.2d at 653 (emphasis added). He was released around 11:30 a.m. after giving a sober statement, culminating a detention of approximately 11 hours.

Before the court, the defendants in Mr. Golla's unlawful detention suit argued that his detention at the police station was justified because (a) they had probable cause to believe he assaulted Detective McWilliams, and (b) he was a material witness from whom the officers needed to gather information pertinent to the ongoing investigation. First, the court invoked *Lidster* to justify Mr. Golla's removal from the scene as reasonable because he was the only eye-witness, his intoxication and belligerence prevented him from giving a statement there, and both his own property (the Gollas' car) and place of residence were active crime scenes. Second, the court excused his 11-hour detention as reasonable because he could not return

to his place of residence (the McDaniel house) anyway, he was intoxicated for several hours and could not give a proper statement upon first arriving at the station, and he threatened the investigating detective. Further, it was only because he committed a criminal act in the presence of law enforcement that he was arrested and booked, thereby also extending his stay at the police station by several hours. *See, Golla,* 687 F.Supp.2d at 656-58. In the *Golla* court's reckoning, these were "exceptional circumstances." *Id.* at 658.

Far from bolstering Defendants' argument, *Golla* undercuts it. None of the "exceptional circumstances" in *Golla* finds an analogue here. Simmons's arrest report indicates that he was not intoxicated (Pl.'s St., Ex. D, p.4), and Simmons was merely an occasional visitor to the residence (not an out-of-towner residing there). (ECF No. 84 ¶ 7.) None of his property was implicated as an active crime scene. Simmons was compliant throughout and did not commit any crimes that would otherwise warrant arrest. Further, as noted above, Simmons was not the only eyewitness to the shooting of Officer Derouin and, given that he was face down on the floor at the crucial moment, he was probably an exceedingly poor eyewitness relative to the four arrested individuals who were on the first floor of the residence. Absent from the record are sufficient facts to

determine why, under the *Golla* rationale Defendants posit, Simmons's witness statement could not simply have been taken at the scene.

Therefore, Simmons's approximately 14-hour arrest was not permissible as a mere investigatory detention under *Lidster*, and *Golla* further confirms that his booking, fingerprinting, and time in lockup can only be categorized as a custodial arrest.

*     *     *

Simmons's removal in handcuffs from the residence and transport to the police station constituted a formal arrest of Simmons. In keeping with that analysis, Simmons's subsequent 14-hour stint in custody at the police station also constituted an arrest rather than an investigatory detention. The crucial questions, then, are whether Piechocki had probable cause to order Simmons's arrest such that it was reasonable, whether he is responsible as a matter of law for Simmons's ensuing 14-hour arrest, and whether any of the other Defendants are liable as a matter of law.

### 2. *Probable Cause*

#### a. *"Sunny"*

The crux of Defendants' argument that Piechocki had probable cause to arrest Simmons as "Sunny," the target of the search warrant, is that he sufficiently met the warrant's

physical description. Defendants argue that Simmons "substantially fit" the description of "Sunny" (Response at 18), and Defendant Officers testified that Simmons "could have been" and "possibly" matched the description of "Sunny." (*See, e.g.,* D'Amato Tr. 56:2-17.) Defendants also stress that Simmons was found in the basement, from which the warrant indicated that drug sales were emanating. Despite introducing relevant testimony from the other Defendant Officers, neither party provided the Court with testimony from Piechocki about his own analysis of these characteristics. What follows is an examination of the characteristics of Simmons that did not match the description of "Sunny."

## I. Complexion

The search warrant described "Sunny" as dark in complexion. Simmons's arrest report, on the other hand, listed his complexion as "medium brown." Although a technical mismatch, complexion is a fairly subjective characteristic. The Court on summary judgment resolves the reasonable inferences from these facts in Defendants' favor. Thus, a reasonable jury could find that Simmons sufficiently fit the warrant's description of "Sunny's" skin complexion.

## II. Weight

On March 9, 2014, Simmons weighed 165 pounds. The search warrant described "Sunny's" weight as 140-160 pounds. Although Simmons falls above the upper end of the weight range, the Court recognizes that requiring a more precise match of a suspect's weight to a warrant's description would be onerous for all but the professional carnival guesser. Given how close Simmons's weight was to the reported range for "Sunny," the Court finds that reasonable inferences from this undisputed fact favor Defendants on summary judgment.

## III. Age

Here, Defendants' narrative begins to unravel, requiring the Court to make heroic (rather than reasonable) inferences in their favor. On March 9, 2014, Simmons was sixty-seven (67) years old. The warrant listed "Sunny's" age as between 45 and 50 years old. The officers have, perhaps unsurprisingly, testified that Simmons appeared anywhere from his "upper 40s" to "50s" (Otten Tr. 44:15-18; MacFarlane Tr. 42:6-7; D'Amato 56:6-8). That not one of the Defendant Officers could peg a 67-year-old man as even a sexagenarian is bewildering.

## IV. Height

Simmons is almost six feet tall – 5' 11", to be precise. The search warrant listed "Sunny's" height as 5'5"-5'8",

significantly shorter than Simmons as well as the average African-American male. *See, e.g.,* National Health Statistics Reports, No. 10 (2008), https://www.cdc.gov/nchs/data/nhsr/ nhsr010.pdf (reporting 69.8, 68, and 65.4 inches as the 50th, 25th, and 5th percentiles, respectively, for 40-59 year old non-Hispanic black males). Thus, "Sunny's" height fell somewhere between the 5th and 25th percentiles. Simmons, on the other hand, is just shy of 6 feet tall. Whether measured from the perspective of 40-59 year old non-Hispanic black males or those age 60 and up, Simmons's height falls somewhere between the 75th and 85th percentiles. *See, id.*

Defendants explain that Simmons was seated when they entered the basement kitchen and then lying on the floor for the majority of the action, such that they could not adequately gauge his height. While the other Defendant Officers, in light of the fluid situation immediately after Officer Derouin's shooting, may not have had a reasonable opportunity to gauge his height, whether Defendant Piechocki had such a chance is less clear from the record. Indeed, probable cause to arrest and hold Simmons as "Sunny" would seem to require Piechocki to have at least compared all of Simmons's physical characteristics against those attributed to "Sunny." Further, Piechocki testified that he heard Simmons say "I shit on myself" when he

was being escorted to one of the transport cars, suggesting that he had at least some opportunity to gauge his height. (Piechocki Tr. 62:15-22.)

## V. Hair

The differences between "Sunny's" hairstyle as reported on March 8, 2014 and Simmons's hairstyle as observed on March 9, 2014, were profound. In contrast to "Sunny's" "dark hair worn long and wavy," Simmons at the time looked "bald," a fact corroborated by his arrest photo. No one disputes that Simmons's hair was not even close to a match.

Defendants protest that "[i]t is not unusual for people to cut their hair of [sic] shave their heads." (Response at 13.) True enough. But other undisputed facts make this possibility exceedingly unlikely, indeed hardly conceivable. First, the search warrant recites John Doe's statements to Defendant D'Amato that, on March 8, 2014, he had purchased crack cocaine from "Sunny." It was on this March 8, 2014 purchase that the warrant's physical description was based. The inference that "Sunny" shaved his flowing locks within 24 hours of John Doe's report is hardly fathomable. Such an inference constitutes a heroic one, and courts need not draw every conceivable inference from the undisputed facts in favor of the non-movant. *See,*

*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987).

### VI.   Cerebral Palsy

Finally, it is undisputed that Simmons has cerebral palsy. Defendants' own audio-video evidence of Simmons's voluntary statement to police at the end of his custody indicates that his speech is noticeably impaired, likely a result of dysarthria. The search warrant relays several statements reportedly made by "Sunny" to Doe. (*See,* Defs.' St., Ex. C, p.2 ("What do you want and how much?"); *id.* ("[M]eet me at the back door."); *id.* at p.3 ("You know I got the best shit around. Come back when you need some more.").) A reasonable jury would question why Doe did not at least mention that "Sunny" spoke with a speech impediment. And yet nowhere in the search warrant's detailed recitation of John Doe's interaction with "Sunny" is there such an indication. Rather than willfully blinding itself to this profound absence, the Court finds that the reasonable inference to draw from this lacuna in the otherwise detailed description of "Sunny" is that "Sunny," unlike Simmons, did not speak with any obvious impediment or difficulty.

\*   \*   \*

Contrary to Defendants' contention that Simmons's "height, weight, age, gender, and race all met the description of

'Sunny,'" the Court finds that, on the evidence presented, only Simmons's gender and race – the most generic characteristics – precisely matched the warrant. Five other characteristics did not match, and at least two of these incongruities (height and hair) were profound. Further, Simmons's conspicuous speech disability was glaringly absent from the warrant's description of "Sunny."

The Court is willing to find that a reasonable jury could find in Defendants' favor on two of these characteristics (complexion and weight). It strikes the court as quite generous to resolve the inferences from the testimony about Simmons's youthful appearance in favor of Defendants, but it is prepared to do so on Plaintiff's Motion. The mismatch in height, however, is a bridge too far, as a reasonable person would have noticed at the very least that Simmons was taller than average (whereas "Sunny" was reported to be much shorter than average). And the stark mismatch in hairstyles confounds a finding of probable cause even further. Particularly after speaking with Simmons, as Defendants MacFarlane and Piechocki did before he was transported to the police station, a reasonable police officer could not believe that probable cause existed to arrest Simmons on the basis that he was "Sunny."

This is not a case where the arrestee substantially matched key unique characteristics described in the search warrant. *See, e.g., U.S. v. Stubblefield,* 820 F.3d 445, 448-49 (D.C. Cir. 2016) (finding probable cause to arrest an individual for suspected bank robbery where he matched two "distinctive" characteristics recited in the suspect's description:  a height in the 5th percentile of middle-aged African-American men, and a "unique facial disfigurement"); *Reed v. Baca,* 800 F.Supp.2d 1102, 1108-09 (C.D. Cal. 2011) (finding that deputies had probable cause to arrest, even though arrestee was not the actual subject of the warrant, where the arrestee "was a virtual match to the descriptors in the warrant:  same name, birth date, race sex, height, weight, license plate number, and driver's license number").   Instead, Simmons only matched the most generic characteristics.

That Simmons was "found in the basement, the place where the alleged drug transactions took place," does not compel a different result.  (Response at 18.)   "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979).   This requirement "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable

cause . . . to search the premises where the person may happen to be." *Id.*

Per *Ybarra,* the privacy interests of an owner of the situs of illegal activity described in a warrant are separate and distinct from those enjoyed by persons found there. That a warrant authorizes a search of a residence or business does not mean that any person found there is subject to seizure purely by virtue of his or her "mere propinquity" to illegal activity. *Ybarra,* 444 U.S. at 91. Rather, there must be an independent basis to seize that person. Here, Defendants have argued that such a basis for arrest existed because of similarities between "Sunny" and Simmons. The Court finds as a matter of law on the facts presented that the asserted similarities do not amount to probable cause. As discussed below, neither can a theory of "constructive" possession clear the probable cause hurdle.

### b. Possession of a Controlled Substance

Defendants appear to argue that, when considered in light of Simmons's resemblance of "Sunny" and presence in the basement, the discovery of a small amount of crack cocaine on the first floor of the residence gave rise to reasonable suspicion that Simmons constructively possessed a controlled substance. Defendants appear to concede in their briefing that Piechocki did not have probable cause, only reasonable

suspicion, to arrest Simmons based on possession of a controlled substance. (*Compare,* Response at 15-16 (arguing that Piechocki had "reasonable suspicion that Simmons was in constructive possession of narcotics"); *with id.* at 16-19 (arguing only that Piechocki had probable cause to believe that Simmons was "Sunny").) Nevertheless, the Court will genuflect to the non-movants and treat Defendants' argument in its strongest possible form.

## I. Constructive Possession

Constructive possession requires that a person "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *U.S. v. Kitchen,* 57 F.3d 516, 520 (7th Cir. 1995) (citation omitted). Defendants note that possession can be either sole or joint. *See, id.* (citation omitted). And yet, "something more than mere proximity is required [for constructive possession]: a nexus between the accused and the relevant items." *U.S. v. Morris,* 576 F.3d 661, 667 (7th Cir. 2009) (finding constructive possession where a man, who had been often seen at the house where drugs were found, fled within the house from the drugs' location and made a statement about it being his house). Where, for example, illegal drugs were found in the defendant's niece's house and in a backpack that could

not be attributed to him, there was no nexus or "substantial connection," and thus no constructive possession. *See, U.S. v. Windom,* 19 F.3d 1190, 1200 (7th Cir. 1994). Compare this to a classic case supporting a nexus finding. *See, People v. Besz,* 802 N.E.2d 841, 849 (Ill. App. 2004) (holding that the defendant had constructive possession over drugs found in the room where the defendant was passed out from a drug overdose).

Therefore, constructive possession requires proximity of the defendant *and* an additional factor showing the defendant's ability to exercise dominion or control. As the Seventh Circuit has put it, "[p]roximity must be coupled with other evidence, including connection with an impermissible item, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise." *U.S. v. Reed,* 744 F.3d 519, 526 (7th Cir. 2014) (quotation omitted).

In this case, there is no dispute that Simmons did not own the residence. This fact was readily ascertainable; sometime on March 9, 2014, Chicago police detectives prepared a General Progress Report specifying Simmons's address as 222 W. 106th Place, not the residence. (Simmons's arrest report also indicates as much.) However, Piechocki did not ask Simmons whether he owned or even lived at the residence before ordering his arrest, and thus he had no basis to believe that Simmons had

a right or the ability to control the drugs. Thus, the only circumstance facing Piechocki was Simmons's proximity to the drugs, and it was fairly weak proximity at that. The small bag of narcotics was found in a common area of the same residence in which Simmons was eating dinner, but on a separate floor of the residence – closer and more accessible to at least four other individuals upstairs. While the concept of joint constructive possession might have more purchase as applied to them, it fails as applied to the considerably more remote Simmons.

None of the Defendant Officers saw Simmons on the first floor at any point that night. And nothing suggests that Simmons otherwise enjoyed the requisite right or ability to control the narcotics: he had no other connection with them and no demonstrated motive to possess them; he made no gesture implying control or evasive conduct; and nothing about the situation otherwise indicated his involvement in criminal enterprise. The fact that Simmons was found in the basement, where the warrant indicated drug sales were made, is not a nexus specific to Simmons's ability to control the bag of crack cocaine, which was found upstairs. Thus, there is no requisite nexus for constructive possession.

Defendants' invocation of *U.S. v. Jones,* 763 F.3d 777 (7th Cir. 2014), is without merit. There, the government did not

rely on the defendant's proximity to the narcotics alone but instead proved nexus by introducing recorded telephone calls in which the defendant sought to buy distribution quantities of crack cocaine coupled with evidence that the phone from which these calls were made (along with the defendant's car) were repeatedly seen at the residence in issue. Neither is *Regalado v. Hayes,* No. 11-C-1472, 2011 WL 5325542 (N.D. Ill. Nov. 3, 2011), helpful to Defendants. There, Regalado was sleeping over, as she occasionally did, at her boyfriend's apartment when police executed the search warrant for the apartment. *Id.* at *1. The court refused to find constructive possession on the facts alleged – where neither the drugs nor a gun recovered on the premises were "in Regalado's view," and police failed to "recover direct evidence that Regalado owned, leased or controlled the premises, such as mail addressed to her or her name on the door." *Regalado,* 2011 WL 5325542 at *5 ("There is nothing beyond her mere proximity to support any finding of constructive possession.").

Quite simply, Piechocki neither attempted to establish nor was presented with evidence of nexus specific to the drugs recovered. Therefore, this case is quite distinct from *Jones* (strong evidence of nexus via telephone calls) and *Morris* (frequent visitor fled from the room where drugs were found and

also claimed the house was his), and much more like *Windom* (visiting uncle did not constructively possess drugs found at niece's house) and *Regalado* (no ability to control, only mere proximity, where contraband was not in view of the visiting plaintiff). Therefore, no facts before the Court indicate that a reasonable officer could believe probable cause existed to arrest Simmons for constructive possession. Ultimately, as explored below, even a stronger connection between Simmons and the crack cocaine would be immaterial, because Piechocki was aware of no evidence of narcotics until after he ordered Simmons's arrest.

## II. *Post Hoc* Justification

Even if it were reasonable of Piechocki mistakenly to assume that Simmons exercised control over the narcotics (such that qualified immunity could apply), the undisputed facts indicate that Piechocki made the decision to order Simmons's arrest *before he saw narcotics at the residence.* Piechocki's own testimony indicates that he saw the small bag of crack cocaine while he was "organizing everybody to get transported." (Piechocki Tr. 77:10-19.) As explained above, Piechocki's order that Simmons be removed to the police station in handcuffs amounted to a formal arrest of Simmons. Therefore, the probable cause for that arrest must have antedated the arrest itself.

*See, e.g.*, *Hamilton v. Village of Oak Lawn, Ill.*, 735 F.3d 967, 970 (7th Cir. 2013) ("If what may have begun as a *Terry* stop became . . . an arrest before the police acquired probable cause, the arrest was unlawful."); *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) ("[P]ost-hoc justifications based on facts later learned cannot support an earlier arrest."). Because organizing the civilians for transport logically must have occurred after (even if only shortly after) Piechocki gave the order to transport them, discovery of the bag of crack cocaine cannot undergird probable cause for Simmons's earlier arrest. Thus, the undisputed facts indicate that Piechocki ordered Simmons's arrest before he was aware of any evidence of narcotics at the residence.

Defendants might argue that, regardless of whether discovery of the crack cocaine could justify Piechocki's decision to arrest Simmons, it makes his protracted confinement at the police station (more) reasonable. Incorrect. First, the law just cited stands for the proposition that *post hoc* justifications cannot support an earlier arrest, full stop. This does not apply only to Piechocki's decision to arrest, but also to subsequent detention pursuant to that arrest. Second, for the same reasons discussed above in Section II.C.2.b.I, a charge of possession of a controlled substance utterly lacked

probable cause anyway. The facts indicate that officers readily determined at some point on March 9, 2014 that Simmons did not reside at the residence but lived elsewhere. Because there were no indicia of Simmons's ability to control the drugs, probable cause was still wanting.

* * *

For all the above reasons, the Court finds that there was no probable cause to arrest Simmons, either on the basis that he was "Sunny" or on the grounds that he was in (constructive) possession of a controlled substance. For the same reasons, there was no probable cause for officers at the police station to continue holding Simmons, making his approximately 14-hour detention unreasonable. Therefore, because Defendants have offered no facts or legal argument that can be read to dictate otherwise, Simmons's arrest, including his protracted detention and confinement at the police station, was unlawful as a matter of law.

### 3. *Defendant Piechocki*

Because Piechocki ordered and was responsible for Simmons's unlawful arrest, he was a participant in the deprivation of Simmons's constitutional rights for purposes of a § 1983 action. *See, e.g., Moore v. State of Indiana,* 999 F.2d 1125, 1129 (7th Cir. 1993). The undisputed facts belie Defendants' evasive

contention, based only on Piechocki's carefully worded affidavit, that his involvement was limited to directing officers "to remove the civilians from the home." (Defs.' St. ¶ 32.) While Simmons admits that Piechocki did indeed order his removal from the home, testimony of Defendant Officers furnished to the Court clearly establishes that Piechocki's role was not so limited. (*See, e.g.,* Otten Tr. 101:21-102:19 ("I believe Sergeant Piechocki had ordered everyone to go to the Area for the investigation . . . . He said[,] I told them to bring them to the Area."); D'Amato Tr. 91:18-92:14 ("[A]ll individuals were removed from the house and brought in per the sergeant."); Piechocki Tr. 62:9-14 ("Q. But, I mean, when he was placed under arrest, what was the reason or probable cause you had to put him in handcuffs and take him to the police station? A. That he might have been the target of the warrant at the time.").) Thus, Defendant Piechocki ordered Simmons's removal to the police station in handcuffs and not merely from the residence.

### a. *Qualified Immunity*

Qualified immunity from liability for an unlawful arrest will clothe an officer in protection if "a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Eversole v. Steele,* 59 F.3d

710, 717 (7th Cir. 1995) (internal quotation marks omitted). Although the inquiry focuses on what the officer knew, not whether he or she should have known more, qualified immunity will not apply where there was no evidence supporting a factual basis for an arrest. *See, Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 458-59 (7th Cir. 2010) (withholding qualified immunity where "the reasons that [the officer] initially gave [for probable cause] . . . were not known to him at the time").

As the discussion in the previous subsection suggests, Piechocki on the undisputed facts cannot have mistakenly but reasonably believed either that Simmons fit the description of "Sunny" or that he constructively possessed narcotics. First, the relevant legal principles of probable cause and constructive possession were clearly established in March 2014 and have not changed in relevant part since, as evidenced by the vintage of the cases the Court has cited throughout this opinion. Second, nothing in the record suggests a basis for finding that Piechocki made a reasonable mistake of fact. Indeed, with respect to the narcotics, his own testimony indicates that he had not even discovered the bag of crack cocaine at the time he gave the order that amounted to an arrest of Simmons. And even if he had, he made no inquiries of Simmons relevant to his nexus

or ability to control the drugs, and no other relevant facts have been presented to the Court. Piechocki is thus ineligible for qualified immunity.

In the same vein as their arguments based on *Lidster* and *Golla,* Defendants argue that even if Simmons's arrest was unlawful, Piechocki is entitled to qualified immunity because he reasonably believed the only way to secure the crime scene after Officer Derouin's shooting was to transport all the civilians to the police station. (*See,* Response at 24.) Defendants further stress that this was not an ordinary execution of a search warrant and that special allowances should be made to arrest people like Simmons, who were purely in the wrong place at the wrong time, without satisfying the normal constitutional requirements of probable cause.

The Court is sympathetic to the plight of officers in the field confronted with chaotic situations like the one facing Defendant Officers on March 9, 2014. Indeed, the Court finds Simmons's initial detention and handcuffing at the scene reasonable in light of the need for safety. (*See,* Sections II.A and II.B, *supra*.) Requiring officers in the heat of such a situation, where there is pending violence or a clear danger thereof, to make individualized determinations about an individual's threat level or culpability, would impose an

unrealistic burden and increase the already steep risks to which police are exposed.

However, when the dust after a violent situation has settled and all potential perpetrators and witnesses are restrained, it is unreasonable for trained officers then to be relieved of making individualized assessments. If the definition of reasonableness were as pliable as Defendants advocate, then the privacy and liberty interests of citizens would steadily erode. There would be no temporal or substantive limiting principle for when the strictures of probable cause would be relaxed. The Court is not willing to set a precedent for arresting otherwise docile, cooperative, and unthreatening individuals simply because a previously volatile and dangerous situation existed within the same building in which they are found. Probable cause, like sound police work, is needed most at the margins and in situations not of the garden variety.

That there was substantial danger to officers prior to Piechocki's decision does not bless arresting individuals without probable cause after the threat has subsided, nor does it make reasonable a blanket decision to remove all civilians in handcuffs to the police station as potential witnesses without regard to their actual involvement. (Perhaps this explains why Defendants have resorted to a case from the Western District of

Louisiana of limited persuasive value and dubious relevance.)
On the facts presented, Piechocki's decision to order Simmons's
arrest without probable cause is not entitled to qualified
immunity purely because of Officer Derouin's shooting.

### b. *Foreseeability*

Given that Piechocki is not entitled to qualified immunity,
the Court must examine whether Simmons's unreasonable 14-hour
detention behind bars at the police station was foreseeable as a
matter of law. Defendants protest that Piechocki had no role in
ordering Simmons's prolonged stint in lockup at the police
station. That is not the relevant question. The question is
whether ordinary rules of tort causation, which apply to
constitutional tort suits, dictate that Simmons's unreasonable
14-hour detention was foreseeable on the facts presented. *See,
e.g., Parrett v. City of Connersville,* 737 F.2d 690, 695 (7th
Cir. 1984). (The Court notes that Plaintiff can clearly show
but-for causation; in the absence of his unlawful arrest, he
would not have been unreasonably detained for 14 hours.)

The data points in the case law are generally unfavorable
to Piechocki. For example, in *Herzog v. Village of Winnetka,
Ill.,* 309 F.3d 1041, 1044 (7th Cir. 2002), the court held that
"indignities inflicted on the hapless victim [of an illegal
arrest], including offensive physical touchings," were

"foreseeable consequences of the illegal arrest" under ordinary tort causation rules. Similarly, in *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1359 (7th Cir. 1985), Judge Posner wrote in concurrence that, "if the arrests or detention were unlawful then any indignities inflicted . . . would be a consequence of the defendants' unlawful conduct for which the defendants would be liable" under tort principles of foreseeability. Thus, to the extent Simmons claims injuries arising from his lengthy arrest and subsequent detention, there is authority for classifying those as the proximate result of his unlawful arrest. *See, e.g., Huddleston v. Pohlman,* No. 06-3009, 2007 WL 647335 (C.D. Ill. Feb. 27, 2007) (denying the defendant's motion *in limine* to bar evidence relating to damages, because criminal charges and bond restrictions were reasonably foreseeable results of the defendant officer's unlawful arrest of the plaintiff).

However, certain facts create a genuine dispute as to whether Piechocki would indeed have been able to foresee what befell Simmons. For example, the facts indicate that authority over the release of certain persons involved in ongoing investigations is typically left to the detectives assigned to investigate the case. More generally, foreseeability and proximate cause are best left to the jury. *See, First*

*Springfield Bank & Trust v. Galman,* 188 Ill.2d 252, 256 (1999). As such, the Court will not determine foreseeability as a matter of law, particularly because the factual record before it is sparse on the issue of whether and to what extent Piechocki could have reasonably foreseen Simmons's lengthy confinement. *See, e.g., Jackson v. Sauls,* 206 F.3d 1156, 1168-69 (11th Cir. 2000). The Court denies the Motion in relevant part.

### 4. *Defendants Otten, D'Amato, and MacFarlane*

The Court denies Plaintiff's Motion as to Defendants Otten, D'Amato, and MacFarlane. For any of them to be liable for Simmons's unlawful arrest and subsequent detention, it must have been a reasonably foreseeable consequence of their involvement. The uncontested facts indicate that Otten played no role in detaining Simmons whatsoever. D'Amato briefly detained Simmons at the residence immediately following Officer Derouin's shooting, and then handed him off to MacFarlane. MacFarlane handcuffed Simmons at the scene before handing Simmons off to officers unknown. Uncontested testimony makes clear that all three departed the residence to visit Officer Derouin before Piechocki's decision to arrest and transport Simmons. They might well have expected Simmons to be released from handcuffs once his statement was taken at the scene. At the very least, a reasonable jury could find that Simmons's arrest and subsequent

prolonged detention were not reasonably foreseeable results of these Defendants' involvement.

### 5. *City of Chicago*

The Court also denies Plaintiff's Motion as to the City of Chicago. For a municipality to be found liable under § 1983, the plaintiff must prove that a municipal policy or custom caused their injury. *See, City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988); *Abbott v. Village of Winthrop Harbor,* 205 F.3d 976, 981 (7th Cir. 2000). Municipalities are not vicariously liable for the constitutional torts of their agents. *Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir. 1992). Simmons's summary judgment briefing does not allege that any specific City policy is responsible for his constitutional injury.

To the extent that the City's policy of transferring jurisdiction over arrestees from officers to investigating detectives contributed to Plaintiff's injury, the record is not sufficiently developed for Simmons to win summary judgment. Other policies evident from the summary judgment briefing, such as the City's policy of designating search warrant affiants as arresting officers or of handcuffing occupants of premises subject to a search warrant, cannot be said to have produced the injury this Court is prepared to recognize on Plaintiff's

Motion: his unlawful arrest at the hands of Defendant Piechocki.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court denies Plaintiff's Motion [ECF No. 78], except as to the issue of Defendant Piechocki's liability for Plaintiff's unlawful arrest. The Court grants Plaintiff's Motion as to Defendant Piechocki for unlawfully and unreasonably ordering his arrest without probable cause. However, genuine disputes of material fact remain as to whether any Defendant Officers could reasonably have foreseen the protracted and unreasonable detention following Plaintiff's arrest.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: February 7, 2017