IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT LEE SIMMONS,

                Plaintiff,

      v.

THE CITY OF CHICAGO,           Case No. 14 C 9087
ILLINOIS, a Municipal
Corporation; CHICAGO POLICE     Judge Harry D. Leinenweber
SARGEANT JOHN PIECHOCKI
#1349; CHICAGO POLICE
OFFICERS MARK D'AMATO #6150,
MARVIN OTTEN #2773, and
TIMOTHY MacFARLANE #13015,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Defendants' Joint Motion for Summary Judgment on Plaintiff Robert Simmons's ("Simmons") 42 U.S.C. § 1983 unlawful detention, excessive force, and supervisory liability claims ("the Motion") [ECF No. 93] is granted in part and denied in part.

The Court grants summary judgment to Defendants on the lawfulness of Simmons's handcuffing and initial detention in the basement of the residence. The Court denies summary judgment to all Defendant Officers on Simmons's unlawful and unreasonable arrest at the residence, but grants summary judgment to

Defendant City of Chicago on this aspect of Simmons's claim. The Court denies summary judgment to all Defendants on Simmons's unlawful detention claim as it relates to detention at the police station pursuant to his arrest. Further, the Court denies Defendants' Motion as to Simmons's excessive force claim, except as to Defendant City of Chicago. It denies Defendants' Motion for Summary Judgment on Simmons's supervisory liability claim.

## I. FACTUAL BACKGROUND

Before delving into the facts at issue on Defendants' Motion, the Court highlights the unusual nature and obfuscating tendencies of the filings in this case. Defendants' Statement of Uncontested Facts, under the auspices of summarizing portions of Plaintiff's deposition testimony, presents facts that are clearly contested. In so doing, Defendants have provided support for two distinct versions of the relevant events. In responding and filing its Statement of Additional Facts, Plaintiff compounds the confusion by introducing certain facts that support Defendants' version of events and others that support his version. What follows is the best parsing of these facts that the Court can manage in light of the tortuous record. For purposes of this Motion, inferences drawn from them are viewed in the light most favorable to Plaintiff (the non-

movant). *See, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

First, the parties do not dispute certain facts in the case, and exhibits attached to both parties' Statements help establish them. On March 9, 2014, Defendants Piechocki, D'Amato, Otten, and MacFarlane (the "Defendant Officers"), along with Officer Thomas Derouin, executed a search warrant at 2725 E. 92nd Street in Chicago, Illinois ("the residence"). (ECF No. 103 ¶ 1.) The search warrant was for narcotics, and its target was an African-American male nicknamed "Sunny," approximately 45-50 years in age, 5'5"-5'8" in height, weighing 140-160 pounds, and with brown eyes, a dark complexion, and black hair worn long and wavy. (*Id.* ¶¶ 2-3.) The warrant was procured with the assistance of a confidential informant, who claimed to have purchased narcotics from "Sunny" out of the basement door of the residence. (*Id.* ¶ 3.) The warrant relays several statements reportedly made by "Sunny" to the informant (alias John Doe). (*See,* ECF No. 94 (*"Defs.' SOF"*), Ex. C, p.2 ("What do you want and how much?"); *id.* ("[M]eet me at the back door."); *id.* at p.3 ("You know I got the best shit around. Come back when you need some more.").)

Plaintiff Robert Simmons is an African-American male of medium-brown complexion with brown eyes. (ECF No. 103, Ex. 6

("Arrest Rep."), p.1.)  On March 9, 2014, he was 67 years old, stood 5'11" tall, weighed 165 pounds, and had short hair – either "buzzed or bald." (*Id.*; MacFarlane Tr. 42:17-22)  He lived at 222 West 106th Place in Chicago, Illinois.  (Arrest Rep. at p.1.)  Simmons suffers from cerebral palsy and has a noticeable speech disorder.  (ECF No. 104 ("Pl.'s SOAF") ¶ 17; *see generally* Defs.' SOF, Ex. A.)  What happened at the residence once the officers arrived to execute the warrant is hotly disputed.

## A.  Plaintiff's Account

Simmons was sitting at a table in the basement kitchen when he saw two officers enter the residence.  (ECF No. 103 ¶¶ 4, 9.)  Both were wearing all black, including police vests, with masks pulled over their faces that revealed only their eyes. (*Id.* ¶¶ 6, 15; ECF No. 104 ("Pl.'s SOAF") ¶ 4.)  The first officer who came in fell over, possibly tripping over a rug.  (ECF No. 103 ¶¶ 5, 7; Pl.'s SOAF ¶ 2.)  The second officer came in right behind the first and demanded to know what Simmons was doing.  (Pl.'s SOAF ¶ 3.)  Simmons, sitting at the table, responded that he was eating lasagna. (*Id.* ¶ 5; ECF No. 103 ¶ 9.)  The second officer came to stand by Simmons and then punched him on the right side of his face with a closed fist.  (ECF No. 103 ¶ 10; Simmons Tr. 69:19-71:1.)  Some time while

Simmons was seated and while the second officer was standing there, Simmons saw the first officer's gun discharge. (Simmons Tr. 68:19-69:8, 90:9-91:14.)

After the punch, Simmons stood up, faced the officer, and asked why he had been hit; the officer then struck him in the face a second time. (*Id.* ¶¶ 11-12, 17; Pl.'s SOAF ¶ 6.) He eventually ordered Simmons to the ground, and Simmons complied. (ECF No. 103 ¶ 18; Pl.'s SOAF ¶ 7.) Because the officer was wearing a mask, Simmons cannot identify him. (ECF No. 103 ¶ 14.) The officer was about two inches taller than Simmons, and therefore over six feet tall. (Simmons Tr. 73:10-24.) No other officers entered the basement kitchen between the time Simmons was punched and when he got on the floor. (*Id.* 83:16-19.) During this time, the first officer remained on the floor, not moving. (ECF No. 103 ¶¶ 16, 19.) It took about three minutes from the time the two officers entered to when Simmons got on the floor. (Simmons Tr. 84:15-85:8.)

Although his testimony is somewhat muddy on this point, Simmons apparently heard (but did not see) a second shot while on the ground, which he thought "came out of the house, came out of the kitchen." (Pl.'s SOAF ¶ 12; Simmons Tr. 182:17-184:2.) After the gunshot, the officer who punched Simmons immediately handcuffed him while he was lying face down on the basement

floor. (*Id.* ¶ 13; ECF No. 103 ¶ 20.) About two minutes later, that officer dragged Simmons, still in handcuffs, out of the house and threw him into a police van parked in the alley behind the residence. (ECF No. 103 ¶¶ 21, 23; Pl.'s SOAF ¶ 14; Simmons Tr. 95:8-96:12, 112:10-14.) While being dragged out of the basement, Simmons hit his left knee on a stairway, resulting in injuries. (*Id.* ¶ 18.) Simmons attempted to walk under his own power, but the officer was walking too quickly, a problem exacerbated by Simmons's cerebral palsy. (Pl.'s SOAF ¶¶ 16-17.) He subsequently defecated on himself while being dragged through the back yard of the residence. (*Id.* ¶ 19.) Simmons injured his head when he was thrown into the police van, and an unknown officer subsequently drove him to the 111th Street police station. (*Id.* ¶ 20; Simmons Tr. 100:5-101:11, 102:16-18, 112:15-113:23.) He remained in handcuffs the entire time. (Simmons Tr. 102:2-15.)

Simmons only saw two officers but testified that five or six officers were in the house. (Pl.'s SOAF ¶ 15; ECF No. 103 ¶ 22.) Because the first two officers were wearing pullover masks or hoods, Simmons does not know whether it was Piechocki, Otten, D'Amato, MacFarlane, or Derouin who fell upon entering the residence. He similarly cannot be sure whether it was Piechocki, Otten, D'Amato, or MacFarlane who struck and

handcuffed him, and then dragged him out of the house and threw him in the police van.  (ECF No. 103 ¶¶ 24-25, 27-28, 30-31, 33-34.)

## B.  Defendants' Account

Defendant Otten first entered the basement kitchen of the residence to execute the search warrant and observed Simmons sitting at the table; he identified himself and told Simmons to put his hands up.  (ECF No. 103 ¶ 39; Otten Tr. 38:7-40:10.) Simmons complied, and Otten then proceeded to the front room of the basement, with MacFarlane behind him.  (*Id.* ¶¶ 40, 41.) When MacFarlane passed within a foot of Simmons, who was still sitting at the kitchen table, he heard a crash "like someone fell off a chair."  (Pl.'s SOAF ¶ 9; MacFarlane Tr. 43:21-45:5.) D'Amato, who did not proceed as far into the basement-level rooms as the other Defendant Officers, saw Simmons fall backwards out of his chair after he put his hands up.  (Pl.'s SOAF ¶ 8; D'Amato Tr. 54:11-59:20.)  It was then that he made physical contact with Simmons simultaneous to his falling out of the chair.  (D'Amato Tr. 60:2-8.)  Defendant Piechocki, on the other hand, testified that he heard a chair fall "immediately when" Defendant Officers opened the door to the basement of the residence.  (Pl.'s SOAF ¶ 10; Piechocki Tr. 45:1-10.)  When Piechocki "got inside" the residence, he saw that D'Amato had

"taken control" of Simmons, who was on the floor. (Pl.'s SOAF ¶ 11; Piechocki Tr. 43:19-44:11.)

Otten heard a gunshot when he was in the front room of the basement level, some 7-8 steps from Simmons. (*Id.* ¶ 47.) After clearing that area, he ran back to the basement kitchen. (*Id.* ¶ 48.) Defendant MacFarlane was behind Otten when he went to the front of the residence but ahead of Otten when they returned to the kitchen area. (*Id.* ¶¶ 41, 42, 49.) The gunshot occurred roughly 10 seconds after MacFarlane entered the residence. (*Id.* ¶ 44.) D'Amato also heard a gunshot and saw Officer Derouin fall into the basement kitchen from the stairwell where he was shot. (*Id.* ¶ 45.) D'Amato then proceeded upstairs. (*Id.* ¶ 46.)

MacFarlane handcuffed Simmons because police were executing a search warrant where the target was unknown, a police officer had been shot, and a handgun (Derouin's) came to rest in close proximity to Simmons. (ECF No. 103 ¶ 50.) Unknown uniformed officers relieved MacFarlane of detaining Simmons. (*Id.* ¶ 54.) He went upstairs once relieved of Simmons and, after "a couple of minutes," went to the hospital with D'Amato and Otten to see Derouin. (*Id.* ¶¶ 57-58.)

D'Amato did not remove Simmons from the residence and did not see who did. (Defs.' SOF ¶ 59; D'Amato Tr. 120:23-121:7.) D'Amato and MacFarlane testified that Simmons was a possible fit

for "Sunny." (*Id.* ¶¶ 65-66.) Defendant Officers deny striking
Simmons, and D'Amato denies punching him in the face. (ECF
No. 103 ¶¶ 36-37). Only MacFarlane admits to handcuffing him.
(*Id.* ¶ 38; MacFarlane Tr. 115:7-15.)

### C. Further Undisputed Facts

Throughout the entire ordeal at the residence, Defendant
Officers never considered Simmons a threat, and he fully
cooperated with their requests. (D'Amato Tr. 67:2-6; MacFarlane
Tr. 75:4-10; Otten Tr. 44:5-11.) In an interview with Chicago
Police Detective Thomas Lieber on March 10, 2014, Defendant
D'Amato relayed that a "[s]uspect [was] sitting at kitchen
table" and that there was a "[t]ake down of suspect in kitchen."
(Pl.'s SOAF ¶¶ 26-29.) Defendants "Piechocki, Otten, and
MacFar[lane]" then proceeded "further into basement to clear,"
with D'Amato "[g]etting ready to handcuff suspect in kitchen."
(*Id.* ¶ 29.) A contemporaneous photograph shows D'Amato dressed
in dark-colored jeans, a black hooded sweatshirt, a black
Chicago Police raid vest, black boots, and a black beanie or ski
cap. (Defs.' SOF, Ex. E-3; D'Amato Tr. 117:13-118:5; ECF
No. 103 ¶ 32.)

Defendant Otten played no role in physically detaining or
removing Simmons from the home or in deciding what charge to
place on Simmons's arrest report. (ECF No. 103 ¶ 51.) Once

Derouin was taken to the hospital, Otten went upstairs, spent a minute or less there, and then went back outside. (*Id.* ¶¶ 52-53.)  Contemporaneous photographs of Otten show him wearing medium-dark colored jeans, a camouflage hooded sweatshirt, a black Chicago Police raid vest, and gym shoes. (Defs.' SOF, Ex. E-2; D'Amato Tr. 116:16-12.)

Defendant MacFarlane did not tell anyone to arrest Simmons, nor did he make any decision to remove Simmons from the residence. (Defs.' SOF ¶¶ 55-56.)  A contemporaneous photograph depicts MacFarlane in khaki cargo pants, a gray long-sleeved undershirt with a black short-sleeved shirt over it, a black Chicago Police raid vest, black shoes, and a Chicago Blackhawks ball cap. (Defs.' SOF, Ex. E-4; D'Amato Tr. 118:6-19.)

Defendant Piechocki was only in the home for a few seconds before he heard a gunshot. (ECF No. 103 ¶ 61.)  He went upstairs at some point after the shooting of Derouin and did not see any males with long wavy hair. (*Id.* ¶ 62.)  While organizing the civilians found at the residence for transport to the police station, Piechocki saw a small bag of what appeared to be crack cocaine on the floor of the upstairs living room. (*Id.* ¶ 63; Piechocki Tr. 77:10-78:5.)  Piechocki ordered the civilians to the police station for officer safety and because they were potential suspects with respect to Officer Derouin's

attempted murder and aggravated battery, with respect to possession of a handgun and the narcotics that were found, and because it was unclear who "Sunny" was. (*Id.* ¶¶ 64, 68-69.) When Simmons "was being escorted to one of the transport cars," Piechocki heard him say, "I shit on myself." (Piechocki Tr. 62:15-22.) A contemporaneous photograph shows Piechocki dressed in light-colored jeans, a gray hooded sweatshirt, a black Chicago Police raid vest, and black boots. (*See,* Defs.' SOF, Ex. E-1; D'Amato Tr. at 108:9-22.)

Although evidence has not been submitted to the Court indicating the respective heights of the four Defendant Officers, a comparison of their contemporaneous photographs (which were taken against the same backdrop) indicates that D'Amato and MacFarlane are the tallest. There is no evidence before the Court as to how Officer Derouin appeared on the night in question and whether he could fairly be characterized as wearing "all black."

Once Piechocki left the residence, he had no contact with Simmons and, once the scene was turned over to detectives, he no longer maintained control over custody of the detained civilians. (ECF No. 103 ¶¶ 70-72.) Pursuant to Chicago Police Department orders, the residence was an active crime scene that needed to be secured, and, with only a few exceptions irrelevant

here, civilians are not permitted access to the residence. (ECF No. 103 ¶ 67; Defs.' SOF, Ex. H & H-3.) The search pursuant to the warrant was delayed and had to be completed by an outside unit at approximately 3:00 a.m. on March 10, 2014. (*Id.* ¶ 76.)

Simmons's arrest report recites a charge of possession of a controlled substance, but no criminal complaints were ever filed against him. (Pl.'s SOAF ¶ 21; Arrest Rep. at p.1.) His arrest report was prepared for administrative purposes, with Officers Otten and D'Amato listed as arresting officers because they were affiants of the warrant. (Defs.' SOF ¶¶ 77-79.) None of the Defendant Officers physically detained Simmons once he was at the police station. (*Id.* ¶ 80.)

At the police station, Simmons was photographed, fingerprinted, and then held until being released without charges at 1:25 p.m. on March 10, 2014. (Pl.'s SOAF ¶¶ 21-22.) Simmons gave a voluntary statement to Detective Pat Ford and ASA George Cannellis at approximately 11:45 a.m. on March 10, 2014. (ECF No. 103 ¶ 73; Defs.' SOF ¶¶ 93-94.) At some point prior to that statement, Simmons was informed that he was free to leave. (*Id.* ¶¶ 74-75.) However, he was in "lockup," meaning "in a cell" and "under arrest," for approximately 14 hours - until at least 10:36 a.m. on March 10 when he was transferred "Out Of Lockup for A/S Interviews." (Ford Tr. 42:15-43:1; Arrest Rep.

at p.5)  At his deposition, Detective Ford claimed that Simmons remained under arrest because of possession of a controlled substance and because his role in the shooting of Officer Derouin was unclear.  (Ford Tr. 43:2-17.)  The record before the Court is silent on when, if ever, Simmons was read *Miranda* warnings.

In his arrest photo, Simmons exhibits a black eye on his right side.  (*See,* Pl.'s SOAF ¶ 23 & Ex. F.) ,Photographs taken by his family members the day of his release also indicate a black eye on Simmons's right side, as well as bruises on his left knee and lower leg.  (*See,* Pl.'s SOAF ¶ 24 & Ex. G.)  On March 12, 2014, Simmons sought treatment for his injuries, reporting that "on 3/9/14 he was arrested by the police and thrown into their van and he struck his head and knee," which caused him to complain of "right inner eye redness, outer eye bruising, and pain on right side of head, right knee painful." (Pl.'s SOAF, Ex. H, p.1).  He was diagnosed with a head contusion, "subconjunctival hemorrhage" of his right eye, and a knee contusion.  (*Id*. at p.3.)  He underwent a CT scan on March 13, 2014, which discovered "mild soft tissue swelling on the right temporal region."  (Pl.'s SOAF, Ex. I, p.1.)

## II.  **LEGAL STANDARD**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007).  The Court does not make credibility determinations as to whose story is more believable. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011).  It must consider only evidence that can be "presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

The party seeking summary judgment bears the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine,* 605 F.3d 451, 460 (7th Cir. 2010); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If this burden is met, then the adverse party must "set forth specific facts

showing that there is a genuine issue for trial." *Anderson,* 477
U.S. at 256.

### III.  **DISCUSSION**

Defendants argue that they are entitled to summary judgment
on Simmons's unlawful detention, excessive force, and
supervisory liability claims.  Simmons opposes Defendants'
Motion on the grounds that, first, he has already established
his entitlement to summary judgment on his unlawful detention
claim; and second, there are genuine disputes of material fact
for trial concerning all aspects of his excessive force claim.

The Court agrees in part and disagrees in part with
Simmons's first argument, granting summary judgment to
Defendants on his unlawful detention claim as it pertains to his
handcuffing and initial detention at the residence.  It
reaffirms its prior grant of summary judgment in favor of
Simmons as to Piechocki's liability for unlawfully and
unreasonably ordering Simmons's arrest at the residence.  The
Court further denies summary judgment to the other Defendant
Officers on this aspect of Simmons's claim, grants summary
judgment to Defendant City of Chicago on this aspect of
Simmons's claim, and denies summary judgment to all Defendants
on Simmons's claim arising from his protracted detention at the
police station.

The Court agrees in part with Simmons on his second argument, finding that genuine disputes of material fact preclude summary judgment for all Defendants other than the City of Chicago, to whom summary judgment is granted on Simmons's unlawful force claim. The Court also denies Defendants' Motion for Summary Judgment on Simmons's supervisory liability claim.

### A. Unlawful Detention

Defendants argue for summary judgment on Simmons's unlawful detention claim as follows. First, Defendant Officers Otten, D'Amato, and MacFarlane had no personal involvement in the decision to remove Simmons from the residence or to hold him at the police station. Second, Defendant Piechocki had no involvement in the decision to hold Simmons at the police station for so long. Third, Plaintiff's arrest and entire detention were reasonable. Alternatively, Defendant Officers argue that they are entitled to qualified immunity.

Simmons argues in response that Defendants violated his civil rights, first, when Officer D'Amato detained him at the residence; second, when he was handcuffed there; and third, when he was removed from the residence in handcuffs, transported to the police station, and held behind bars overnight for more than fourteen (14) hours. To the extent any of the individual Defendants did not physically detain or arrest him, Simmons

claims they are liable for failing to intervene to stop the deprivation of his rights. To the extent they retained no control over his subsequent custody at the police station, he argues that it was a foreseeable consequence for which they are liable on ordinary tort principles. (*See, e.g.,* Pl.'s Response at 12-15.)

### 1. *Simmons's Initial Detention at the Residence*

For the same reasons stated in the Court's prior summary judgment opinion in this case, the Court grants in part Defendants' Motion for Summary Judgment as to Plaintiff's unlawful detention claim arising from his initial detention at the residence. Despite the factual morass in this case, Simmons does not dispute that the officer who initially detained him was at the residence to execute a search warrant for the premises on which he was found. Other relevant facts are otherwise in accord with those that formed the basis for Simmons's prior Motion for Summary Judgment. Irrelevant to Simmons's unlawful detention claim is whether Simmons fell out of his chair and was subsequently detained on the basement floor by D'Amato, in accordance with the facts underlying the Court's prior opinion, or punched twice and ordered to the ground, or forced to the ground via a "takedown." Instead, these factual questions go to Simmons's excessive force claim.

*Michigan v. Summers,* 452 U.S. 692 (1981), and its Seventh Circuit progeny authorize a detention of individuals like Simmons, who are found at the premises where a search warrant is being executed*.* In Simmons's case, permissible detention included entering the residence with guns drawn, forcing a show of hands, and detaining him pursuant to the search warrant. *See, e.g., Muehler v. Mena,* 544 U.S. 93, 98-99 (2005) (holding that officers' categorical authorization to detain incident to execution of a search warrant under *Summers* includes authority to use reasonable force to effect detention); *Baird v. Renbarger,* 576 F.3d 340, 344-46 (7th Cir. 2009) (noting that police are entitled to point their guns at citizens "when there is a reason to fear danger," as in execution of a warrant based on "crimes that contain the use of force as an element, crimes involving possession of illegal weapons, and *drug crimes,* all of which are associated with violence") (emphasis added); *Barron v. Sullivan,* No. 93-C-6644, 1997 WL 158321 (N.D. Ill. Mar. 31, 1997) (finding detention lawful where police under a search warrant entered with guns drawn and forced residents of the home to kneel on ground with hands in the air for the first 15 or 25 minutes, during which officers kept guns drawn). Entering the residence with guns drawn or requiring Simmons to remain on the ground did not transform his detention into an arrest requiring

- 18 -

probable cause. Thus, Simmons's detention in the basement of the residence pursuant to the warrant was a reasonable interference with his liberty, and the Court grants summary judgment to Defendants in relevant part.

## 2. *Simmons's Handcuffing and Further Detention at the Residence*

With respect to Simmons's handcuffing at the residence, there are a few additional incongruities between the facts underlying the Court's opinion on Plaintiff's Motion for Summary Judgment and those advanced here. Specifically, it was uncontested there that MacFarlane handcuffed Simmons. Here, by contrast, Simmons testifies that the same officer who used force on him – inferences from the facts suggest it was D'Amato – also handcuffed him. In addition, the timing of the gunshot(s) at the residence is now disputed. Simmons claims that the first officer to enter the residence tripped over a rug and discharged his firearm before, apparently, a second shot was fired within the residence while Simmons was detained on the ground.

Regardless of which story is credited, however, sufficient justification exists under *Summers* to handcuff and continue detaining Simmons for a short time at the residence. Under either version of the facts, Simmons was handcuffed following a gunshot that occurred within the residence. And if, as explained in the Court's prior opinion, the search was

immediately suspended upon the shooting of Officer Derouin (or, as Simmons's telling suggests, the second gunshot), then officers reasonably feared for their safety such that they were justified in handcuffing and continuing to detain Simmons under *Terry* and/or *Lidster* until the residence and its occupants were secure. The mere fact of handcuffing Simmons on the floor for further detention at the residence was reasonable under the circumstances as a matter of law, and cannot support an unlawful detention claim. *See, e.g., Torres v. U.S.,* 200 F.3d 179, 185-86 (3d Cir. 1999) (finding detention lawful where officers executing a narcotics search warrant left handcuffed occupant on the floor, then helped him to a couch, where he remained in handcuffs for 1.5 to 3 hours); *U.S. v. Fullwood,* 86 F.3d 27, 30 (2d Cir. 1996) (officers acted reasonably in handcuffing house's occupant for 15 to 20 minutes while executing search warrant for drugs); *U.S. v. Fountain,* 2 F.3d 656, 663 (6th Cir. 1993) (finding detention reasonable where officers executing a search warrant for narcotics handcuffed house's occupants and forced them to lie face-down while they conducted the search); *U.S. v. Bender,* No. 13-CR-128, 2014 WL 1406300,at *5 (E.D. Wis. Apr. 11, 2014) ("Occupants of a residence may be detained while a search warrant is executed, including with the use of handcuffs, and

such detention does not constitute an arrest.") (citing *Summers,* 452 U.S. at 705; *Muehler v. Mena,* 544 U.S. 93, 98-99 (2005)).

As noted in the Court's prior opinion, the fact that Simmons was not a resident is immaterial. Any person present during the search may be detained for its duration. *See, e.g., U.S. v. Jennings,* 544 F.3d 815, 818 (7th Cir. 2008) (detention of an individual who approached the premises was reasonable); *U.S. v. Pace,* 898 F.2d 1218, 1239 (7th Cir. 1990 (individuals present at the premises being searched may be detained even though they are not residents or occupants). The presence of other individuals within the residence made Simmons's handcuffing all the more reasonable. *See, Muehler,* 544 U.S. at 100.

Therefore, Defendants' Motion for Summary Judgment is granted in part as to Simmons's unlawful detention claim arising from his handcuffing and subsequent detention on the basement floor of the residence.

### 3. *Simmons's Removal from the Residence, Transport to the Police Station, and Lengthy Detention There*

Defendants argue for summary judgment because only Piechocki participated in Simmons's arrest, and his ensuing lengthy detention at the police station was unforeseeable. The problem is that this only accounts for Defendants' own version of events. Simmons has proffered testimony that, interpreted

favorably on summary judgment, suggests the participation of at least one other Defendant Officer in his arrest: D'Amato. Simmons argues that, to the extent any of the other Defendant Officers did not directly participate in his arrest, they culpably failed to intervene to stop the deprivation of his rights, making them liable for his protracted detention at the police station under ordinary tort principles of foreseeability applicable to § 1983 actions. (*See,* Response at 12-15.)

"[T]he law is clearly established that an officer has a duty to intervene to prevent a false arrest . . . if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it." *Morfin v. City of East Chicago,* 349 F.3d 989, 1001 (7th Cir. 2003); *see, Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994). An officer who is present and fails to intervene to prevent other law enforcement officers from infringing constitutional rights of citizens is liable under § 1983 if that officer had reason to know of an unjustifiable arrest *and* a realistic opportunity to intervene to prevent the harm from occurring. *See, Yang,* 37 F.3d at 285 (citing *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir. 1994)) (citation omitted); *accord, Byrd v. Clark,* 783 F.2d 1002, 1006-07 (11th Cir. 1986). The duty does not fall only on supervisory officers but on nonsupervisory officers as well. *See, Byrd v.*

*Brishke,* 466 F.2d 6, 10 (7th Cir. 1972). "Each police officer present has an independent duty to act." *Yang,* 37 F.3d at 286 ("The number of officers present and able to intervene to save an innocent person from unconstitutional summary punishment inflicted by a fellow officer, in no way correlates with any one officer's duty to intercede.").

### a. *Piechocki*

In its prior summary judgment opinion in this case, the Court found in favor of Simmons that, under the circumstances, Piechocki unlawfully and unreasonably arrested Simmons by ordering his removal to the police station in handcuffs. It also found that Simmons's subsequent detention at the police station was unlawful and unreasonable. Nothing in the plethora of new facts implicated by Defendants' Motion compels a different result. To the extent new facts relevant to Simmons's arrest and subsequent detention are now before the Court, they either (a) are entirely in dispute such that summary judgment to Piechocki is unwarranted or (b) do not affect the reasonableness of Simmons's arrest and protracted subsequent detention. As such, the Court denies summary judgment to Defendant Piechocki.

Consistent with the facts presented on Simmons's prior Motion, Defendants argue in their memorandum and have introduced testimony that Simmons was one of six civilians whom Piechocki

ordered to the police station and that none of the other Defendant Officers removed Simmons from the residence or made decisions relative to Simmons's arrest. Piechocki also testified that he shared words with Simmons while he was being removed to a police vehicle for transport. However, Defendants have recited testimony from Simmons that a masked officer, whom Simmons contends (and inferences from the facts suggest) was D'Amato, dragged him out of the basement and threw him in a police van, following which an unknown officer drove the van to the police station with Simmons still in handcuffs.

To the extent these differing narratives are inconsistent with one another, they remain compatible with the Court's prior grant of partial summary judgment against Defendant Piechocki for his role in Simmons's unlawful and unreasonable arrest. This is to say that, whether Piechocki ordered Simmons's arrest or failed to intervene when D'Amato effectuated Simmons's arrest, he remains liable as a matter of law. For example, reading Defendants' testimony against Simmons's testimony does not establish any mitigation of Piechocki's responsibility. His order to remit all the civilians found at the residence to the police station – the lodestar of the Court's prior grant of summary judgment to Simmons – remains factually and conceptually consistent with D'Amato's alleged physical execution of

Simmons's arrest, making the only changed circumstance here an additional direct participant. Alternatively, Piechocki culpably failed to intervene in D'Amato's unlawful arrest of Simmons. First, he had reason to know that a false arrest was occurring based on the lack of articulable facts supporting probable cause. Second, Piechocki's own testimony suggests that this knowledge was coupled with a realistic opportunity to prevent the harm from occurring: if Piechocki was indeed present "when Simmons was being escorted" to a police vehicle and heard him say "I shit on myself," then a jury could certainly find that he flubbed a realistic opportunity to intervene to stop Simmons's unlawful arrest. Particularly because reasonable inferences from the confusing record are drawn in Simmons's favor, the Court denies summary judgment in relevant part to Piechocki.

On the other hand, Defendants' version of events has not changed from those undisputed in the prior Motion with respect to Simmons's lengthy detention at the police station. Defendants still contend that the same reasons undergirded Simmons's lengthy detention there. They also remain adamant that Piechocki retained no control over the custody of Simmons once detectives acquired jurisdiction over the case to investigate the shooting of Officer Derouin. Thus, there is no

reason for the Court to depart from its earlier finding, grounded on thorough analysis, that Simmons's detention at the police station pursuant to his arrest was unlawful and unreasonable. Particularly because inferences from the facts presented on Defendants' Motion are drawn in Simmons's favor, the Court re-affirms this prior finding and likewise denies summary judgment to Piechocki on the issue of Simmons's lengthy confinement at the police station. Fact issues remain concerning the extent to which Simmons's prolonged detention was foreseeable in light of the transfer of jurisdiction over Simmons's custody.

### b. D'Amato, Otten, and MacFarlane

Defendants' testimony suggests that Piechocki alone made the decision to arrest Simmons. Simmons's testimony suggests that D'Amato committed acts that, for the reasons explored in the Court's prior opinion, amount to an arrest as a matter of law. To avoid summary judgment, Simmons argues that, to the extent any of the Defendant Officers did not physically participate in his unlawful arrest, they are liable secondarily. The Court denies summary judgment to Defendants D'Amato, Otten, and MacFarlane because the facts read in the light most favorable to Simmons demonstrate that each of them at least had a reason to know that Simmons was being unjustifiably arrested

coupled with a realistic opportunity to intervene to prevent the harm from occurring. *See, Yang,* 37 F.3d at 285 (noting that the facts demonstrated potential opportunities to intervene despite the fact that the "complaint fails to *explicitly* specify the existence of an opportunity") (emphasis in original).

With respect to D'Amato, a genuine dispute of material fact remains as to whether he is liable for direct participation in Simmons's unlawful arrest, let alone as a secondary actor. Drawing reasonable inferences in Simmons's favor, a jury could find that D'Amato was the officer who, according to Simmons's testimony, stood a couple inches taller than him, wore all black, and sported a mask and who dragged him from the residence, ultimately throwing him in the back of a police van. His potential involvement in Simmons's unlawful arrest, then, goes well beyond secondary liability.

Although they claim little knowledge of Simmons's arrest, MacFarlane and Otten for summary judgment purposes are considered to have been at the residence during Simmons's arrest. All Defendant Officers were part of the same team executing the warrant, and Simmons testified that five or six officers were in the house at the time when he was dragged out of the basement. Simmons testified that this happened within two minutes of his handcuffing, and neither MacFarlane nor Otten

has offered testimony sufficient to establish their departure from the residence that soon. Otten expressly testified that he was at the residence for at least five or ten minutes after the shooting. (*See,* Otten Tr. 66:3-67:20.) And both claim to have left the residence together, along with D'Amato, and gone straight to the hospital to visit Officer Derouin. (*See, e.g.,* MacFarlane Tr. 68:6-10; Otten Tr. 67:10-20.) Thus, sufficient factual support exists for a reasonable jury to conclude that both MacFarlane and Otten were present at least somewhere at the residence during Simmons's arrest.

As to the specific legal requisites of failure to intervene liability, the record is murky on whether MacFarlane and Otten contemporaneously had reason to know of Simmons's arrest. If they were upstairs at the time securing the civilians or otherwise searching the premises, then they may well have been sufficiently and defensibly preoccupied. But if they were, for example, "only ten feet away from" where Simmons was hauled out of the basement and could hear "the noise attending plaintiff's arrest, including the sound of him hitting the . . . police car," then they may well have had sufficient facts to know of Simmons's wrongful arrest. *Smith v. Schield,* No. 12 C 3305, 2016 WL 851987, at *3 (N.D. Ill. Mar. 4, 2016). As in *Schield,* "[t]he evidence, though not overwhelming, is sufficient to

support the inference plaintiff urges." *Id.* Both Otten and MacFarlane were by their own admission aware of Simmons's initial detention and, on inferences from Simmons's testimony, in the house during Simmons's arrest. Thus, a reasonable jury could find that they were likely "informed of the situation" playing out in the basement and, "despite this knowledge, failed to take any action to prevent" D'Amato "from going forward with the" unlawful arrest. *Morfin,* 349 F.3d at 1001.

Alternatively, the record must establish their lack of a realistic opportunity to intervene – not just in D'Amato's alleged wrongful conduct but also in Simmons's subsequent custody. Two claims of Simmons are relevant here: first, as mentioned, that he was dragged across the yard to the police van within just two minutes of being handcuffed; and second, that he remained in the police vehicle in handcuffs awaiting transport to the police station for a period of time, "about a minute or so." (*See, e.g.,* Simmons Tr. 105:16-21.) The record is unintelligible on the precise awareness and activities of MacFarlane and Otten during this time. MacFarlane testified that, once relieved of Simmons, he went upstairs "for a couple minutes" – where he saw no weapons or drugs – and then "round[ed] up Officer Otten and Officer D'Amato" to visit Derouin. (MacFarlane Tr. 67:18-68:10.) Similarly, Otten stated

that he "went straight upstairs" to address the "threat," then went outside for five or ten minutes before traveling with MacFarlane and D'Amato to the hospital. (*See,* Otten Tr. 66:3-67:20.) Thus, inferences drawn in Simmons's favor from Defendants' own testimony support a realistic opportunity during this length of time to intervene, whether by putting a stop to D'Amato's alleged wrongful conduct or by removing Simmons from the police van. *See, e.g., Woods v. Clay,* No. 01 C 6618, 2005 WL 43239, at *11 (N.D. Ill. Jan. 10, 2005) (denying summary judgment based on a determination that, although plaintiff was arrested before defendant officer arrived on the scene, "he may have been in the position to prevent plaintiff from being falsely imprisoned"). Thus, the jumbled and impoverished state of facts cannot bear the heavy burden required to support summary judgment in favor of MacFarlane or Otten.

The Court at this stage does not find the testimony of any deponent persuasive on the failure-to-intervene issue and merely notes that sufficient facts in the record would support a reasonable jury finding in Simmons's favor on this score. Further factual development is needed, as is often the case when determining whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the unlawful conduct. *See, e.g., Lanigan v. Village of E. Hazel Crest, Ill.,*

110 F.3d 467, 478 (7th Cir. 1997) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

The Court notes that Simmons's testimony is virtually silent on the question whether any Defendant Officer could reasonably have foreseen his protracted and unreasonable stint at the police station. Defendants have testified that none of the Defendant Officers participated in his prolonged detention or made any decisions relative to his time at the police station. But the relevant question is whether, assuming Simmons's version of the facts, any of them could be liable for the lengthy detention pursuant to his arrest under ordinary tort principles of foreseeability. As noted, Simmons's testimony supports characterizing D'Amato as the officer who physically effectuated his arrest. And as explained above, the Court is not willing to find as a matter of law that the other Defendant Officers can have no liability for the conduct Simmons alleges.

Because a jury on the facts presented could find any of the Defendant Officers liable directly or secondarily for Simmons's *arrest,* tort law suggests that each such person could be found liable for his protracted confinement at the police station.

*See, e.g., Herzog v. Village of Winnetka, Ill.,* 309 F.3d 1041, 1044 (7th Cir. 2002) (holding that "indignities inflicted on the hapless victim [of an illegal arrest], including offensive physical touchings," were "foreseeable consequences of the illegal arrest" under ordinary tort causation rules); *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1359 (7th Cir. 1985) (Posner, J., concurring) ("[I]f the arrests or detention were unlawful then any indignities inflicted . . . would be a consequence of the defendants' unlawful conduct for which the defendants would be liable."); *Huddleston v. Pohlman,* No. 06-3009, 2007 WL 647335 (C.D. Ill. Feb. 27, 2007) (denying the defendant's motion *in limine* to bar evidence relating to damages, because criminal charges and bond restrictions were reasonably foreseeable results of the defendant officer's unlawful arrest of the plaintiff).

Therefore, the Court cannot grant summary judgment to D'Amato, MacFarlane, or Otten. The relevant facts are simply too disputed to establish circumstances that absolve them from liability, either for direct or secondary liability regarding Simmons's unlawful arrest at the residence and, concomitantly, his subsequent unreasonable confinement at the police station.

The Court notes that these same reasons militate against a finding of qualified immunity here. Although qualified immunity

is a question of law, it requires an evaluation of underlying "specific facts" confronting the officers to determine whether their conduct violates clearly established rights of which a reasonable person would have known. *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir. 1987); *see, e.g., Saucier v. Katz*, 533 U.S. 194, 201 (2001). In this case, available information did not support a reasonable belief of probable cause to arrest Simmons, and so it is certainly not clear that a reasonable officer in D'Amato's, MacFarlane's, or Otten's shoes "would have believed that, at the time he acted" or failed to act, he was within the bounds of the law. *Belcher v. Norton,* 497 F.3d 742, 749 (7th Cir. 2007). As explained in the Court's prior opinion, it was unreasonable to believe that probable cause existed to arrest Simmons based on any resemblance of "Sunny," and neither D'Amato, MacFarlane, nor Otten saw drugs at the residence that night. Thus, they did not possess information supporting probable cause to arrest Simmons. Taking the facts in the light most favorable to Simmons, the evidence is insufficient to entitle D'Amato to qualified immunity for his alleged physical participation in arresting Simmons.

Similarly, where probable cause to arrest is lacking, a jury "may conclude that [an officer uninvolved in the arrest] should have intervened to prevent [the arrest]." *Johnson v.*

*Nichols,* No. 12 CV 5325, 2015 WL 5693114, at *9 (N.D. Ill. Sept. 28, 2015). Specific to qualified immunity, the record does not speak clearly and distinctly about whether MacFarlane or Otten could have reasonably believed that anyone had probable cause to arrest Simmons. To the extent the record is equivocal on whether MacFarlane or Otten could perceive that Simmons was incapable of contributing to the shooting of Officer Derouin – something clear to both D'Amato and Piechocki – they cannot be absolved from failure to intervene liability as a matter of law on the basis of a reasonable belief that his arrest was justified. Again, this is largely a function of the record's uncertainty as to what role D'Amato actually played in effectuating Simmons's arrest, its opacity as to where in the house or yard MacFarlane and Otten were, and its indeterminacy on their awareness and preoccupations at the relevant time.

A trial is therefore needed on the issues of whether and to what extent D'Amato directly violated Simmons's constitutional rights and on whether, by failing to act under the circumstances, the other officers reasonably believed their inaction fell within the confines of the law. *See, e.g., Chelios v. Heavener,* 520 F.3d 678, 691-92 (7th Cir. 2008).

### c. City of Chicago

The Court finds no record evidence whatsoever to support a finding that Simmons's unlawful and unreasonable arrest was pursuant to or caused by a City policy, inadequate officer training, or the like. Thus, the Court grants summary judgment in part to Defendant City of Chicago as to liability for Simmons's unlawful arrest at the residence. However, as explained below, the briefs and record lack sufficient information to grant summary judgment to Defendant City of Chicago as to Simmons's prolonged confinement.

To avoid summary judgment to the City, Simmons must show not only deprivation of a federal right (he has) but also that it flowed from an express municipal policy or custom or the deliberate act of a decisionmaker with final policy-making authority for the City. *See, e.g., Ienco v. City of Chicago,* 286 F.3d 994, 998 (7th Cir. 2002). The governmental entity must in some sense have caused the constitutional violation. *See, Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir. 1994) (citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 692-94 (1978)). While the record is sparse, there is evidence that at least a portion of Simmons's constitutional injury flowed from a City policy. For example, Defendants have argued that, as per City policy, they relinquished their control or jurisdiction

over those arrested at the residence to detectives investigating the shooting of Officer Derouin. For this reason, presumably, Detective Ford became a player in this case, supervising Simmons's custody all through the night of March 9-10, 2014. A reasonable jury could find that this City policy contributed, at least in part, to Simmons's constitutional injury in that the harm attributable to his unreasonable detention at the police station was exacerbated - his confinement extended - because those most apprised of the facts at the residence had no control over his release. If officers actually present at the residence and aware of Simmons's clear lack of involvement in the crimes committed there retained some control over his custody, Simmons's injury might have been substantially mitigated. This transfer of jurisdiction, if done (as Defendants contend) without discretion but solely pursuant to City policy, could then be called a cause of his constitutional injury.

* * *

Therefore, summary judgment is denied to each of the Defendant Officers as to Simmons's arrest at the residence and as to Simmons's protracted detention pursuant to that arrest at the police station. The Court grants summary judgment in part to Defendant City of Chicago as to Simmons's unlawful arrest at the residence, but denies summary judgment to the City as to

Simmons's unlawful and unreasonable detention at the police station pursuant to his arrest.

## B. **Excessive Force and Supervisory Liability**

Simmons alleges for his excessive force claim that a masked officer dressed all in black used excessive force on him by punching him twice, subsequently dragging him out of the basement of the residence, and throwing him into a police vehicle. To the extent other Defendant Officers did not use force on him, Simmons seeks to hold them liable for failing to intervene. Defendants, on the other hand, argue that "the record is void of any excessive force by any of the Defendant Officers," entitling Defendant Officers to summary judgment on Simmons's excessive force claim and Piechocki to summary judgment on his supervisory liability claim. (ECF No. 85 ("Defs.' Mem.") at 6.) Rather than offering governing case law or a compelling argument tailored to Simmons's failure-to-intervene showing, Defendants contend that they are entitled to summary judgment because Simmons cannot identify which Defendant Officer used force on him, making it "undisputed that the Defendant Officers were not personally responsible for the alleged excessive force against plaintiff." (*Id.* at 6.)

The Seventh Circuit has warned against falling for the trap of weighing conflicting evidence during a summary judgment

proceeding. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 655 (7th Cir. 2002), *cert denied,* 123 S.Ct. 1251, 1253, 1254 (2003). Where a defendant police officer's story differs significantly from that of a plaintiff, credibility issues arise that are not amenable to summary judgment. *See, Payne,* 337 F.3d at 770-775 & n.3 ("[W]e cannot choose the version of the story that seems more logical based on the pleadings and testimony before us."). More broadly, summary judgment "in excessive force cases should be granted sparingly." *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009) (citation omitted). This is because, as here, the reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (internal quotation marks omitted).

To avoid summary judgment based on a failure to intervene theory, a plaintiff must have evidence that the non-intervening officers "had reason to know excessive force was being used and had a realistic opportunity to prevent the harm from occurring." *Montano v. City of Chicago,* 535 F.3d 558, 569 (7th Cir. 2008). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all

the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan,* 110 F.3d at 478.

The impediments to summary judgment in this case are legion. First, the nature of D'Amato's conduct is disputed: he contemporaneously admitted to performing a forcible "takedown" of Simmons, but Simmons maintains instead that he punched him multiple times. D'Amato claims no further interaction with Simmons after detaining him in the basement, whereas Simmons's testimony suggests D'Amato dragged him out of the basement and threw him into a police vehicle. Second, it is unclear how many and which officers were present to witness these incidents. Simmons's account claims just one other officer was present for the first episode in the basement, whereas Defendant Officers' testimony supports the inference that all of them were present for D'Amato's first use of force. While Defendants Otten, D'Amato, and MacFarlane claim they left the house soon after Officer Derouin was shot to visit him at the hospital, Simmons's testimony supports the inference that they were still at the residence when the alleged second episode of excessive force occurred.

### 1. Episode I: The "Takedown" or Alleged Punching

Defendants' contentions are belied by undisputed record evidence as well as by Simmons's own testimony. There is

undisputed evidence in the form of the General Progress Report that D'Amato *at the very least* used force on Simmons by performing a "takedown." The testimony of Defendant Officers suggesting that Simmons fell backwards to the ground from his chair cannot overcome D'Amato's recitation of the events to Detective Lieber just after the incident. Where the summary judgment record is not entirely harmonious as to whether putting the plaintiff on the floor was a matter of design or whether he tripped, courts have assumed an intentional "takedown." *See, e.g., Ortiz v. City of Chicago,* No. 09-CV-2636, 2010 WL 3833962, at *3 (N.D. Ill. Sept. 22, 2010) (citing evidence that the arresting officer "used emergency takedown" on the plaintiff). What that "takedown" entailed and whether it was reasonable are not answerable on the record before the Court, and are instead fodder for the jury. As in *Ortiz,* "Defendants never briefed the question of whether the specific use of force in conducting an 'emergency takedown' was reasonable under the circumstances of this case." *Id.* at *12. Instead, Defendants appear to have run away from the fact that D'Amato used force at all. Thus, there is sufficient evidence of force used by D'Amato (and no evidence of whether it was reasonable under the circumstances) to deny summary judgment to D'Amato in relevant part.

Seventh Circuit precedent puts paid to Defendants' argument that Simmons's inability to identify which Defendant Officer allegedly used force compels summary judgment in their favor. In *Miller v. Smith,* 220 F.3d 491 (7th Cir. 2000), the court expressly rejected this argument. There, the defendant officers argued that the plaintiff could not "bring excessive force claims against any of the officers because he could not specify which one of them attacked him." *Id.* at 494-95. Because there was evidence in the record that "whichever officer was not directly responsible for the beating was idly standing by," the court reversed the district court's grant of summary judgment for the defendant officers. *Id.* at 495. There is analogous evidence here. While Defendant Officers might object to any characterization of their actions during execution of the search warrant as "idly standing by," they have "acknowledge[d] presence during the critical time period" when D'Amato used some force maneuver on Simmons. *Taylor v. Kveton,* 684 F.Supp. 179, 183 (N.D. Ill. 1988). This is sufficient for Simmons to avoid summary judgment for the other Defendant Officers on a failure to intervene theory. *See, id.*

Similarly, with respect to the punches Simmons alleges D'Amato threw, Defendants have not shown that the other Defendant Officers had no realistic opportunity to intervene.

Even if D'Amato's pugilism surprised everyone, the officers at least "could have cautioned [Officer D'Amato] against striking Plaintiff the second time, if not the first time." *Trepanier v. Davidson,* No. 03 C 6687, 2006 WL 1302404, at *13 (N.D. Ill. May 5, 2006). Other record evidence is similarly unhelpful on this point: MacFarlane claims he was just a foot away from Simmons when he "crashed" to the ground, and Otten claims to have seen Simmons lean back in his chair. Whether a jury believes that D'Amato's force was limited to a "takedown" or credits Simmons's testimony that he was punched, it could nonetheless find based on their presence (inferred here) that MacFarlane and Otten were aware of it and spurned a realistic opportunity to intervene.

Specific to Piechocki, the sergeant and Defendant Officers' ranking supervisor, Simmons also alleges supervisory liability for failing to control his subordinate's use of excessive force. Supervisory liability for constitutional torts attaches when supervisors "know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988); *accord, T.E. v. Grindle,* 599 F.3d 583, 588 (7th Cir. 2010).

Depending on whether it believes D'Amato's testimony that Piechocki went farther ahead of him towards the front of the basement of the residence or other testimony that Piechocki remained outside the basement and entered to find Simmons detained, the jury could find that Piechocki failed to intervene to stop the force exerted during the first episode. As in *Ortiz,* Piechocki might have "arrived on the scene *after* Plaintiff was put on the floor with an 'emergency takedown' move," meaning that he "could not have observed the facts preceding the encounter . . . which may have made [] use of force reasonable or unreasonable." *Ortiz,* 2010 WL 3833962 at *10 (emphasis in original). Alternatively, he might have been present to observe the punches or "takedown" and thus had the same opportunity to intervene as MacFarlane and Otten. *See, Abdullahi,* 423 F.3d at 774. Relevant testimony therefore conflicts on whether Piechocki was present in the basement for D'Amato's interaction with Simmons or walked into a *fait accompli.* The record is even more indeterminate on whether, if Piechocki was not present, he purposefully kept a wall between himself and the inside of the basement so as to "turn a blind eye" to what his subordinates were doing there in the early stages of the encounter. Thus, for reasons similar to those applicable to MacFarlane and Otten, Piechocki is not entitled to

summary judgment on Simmons's claim that he failed to intervene and/or failed to supervise with respect to Simmons's "takedown" or alleged punching.

Therefore, even if it were undisputed that the *only* force at issue was D'Amato's takedown of Simmons, summary judgment would still be inappropriate because the record is too impoverished to decide (a) the reasonableness of this force as a matter of law and, accordingly, (b) the secondary liability of the other Defendant Officers. Defendants do not even appear to acknowledge D'Amato's "takedown," let alone argue that it was reasonable. Simmons's testimony confounds the analysis further by alleging force in the form of multiple punches. Accordingly, the Court denies summary judgment to all Defendant Officers as to Simmons's excessive force claim arising from his "takedown" or alleged punching in the basement.

### 2. *Episode II: Alleged Force during Simmons's Arrest*

There is less evidence in Defendants' version of events that supports Simmons's second alleged incident of unlawful force – being dragged out of the basement and thrown into a police van. However, Simmons has introduced sufficient evidence to create a jury question on his version of the events surrounding his forced exodus from the basement.

First, the Court acknowledges Simmons's contemporaneous statements to medical professionals and his later deposition testimony, both of which attribute his leg and head trauma to police dragging him from the residence and throwing him into a police vehicle. His deposition testimony more specifically faults the same masked officer who perpetrated the first incident of alleged excessive force. Drawing inferences in Simmons's favor, the Court assumes this person was D'Amato.

Second, the Court notes that Simmons offers photographic and medical evidence consistent with a punch to the right side of his face and injuries to his leg. *See, Abdullahi,* 423 F.3d at 771 (distinguishing cases granting summary judgment in the defendants' favor where "the relevant medical evidence did not reveal injuries consistent with excessive force"). Thus, D'Amato is not entitled to summary judgment on the second episode comprising Simmons's excessive force claim. The question is whether the other Defendant Officers, on the basis of the record, are absolved of failing to intervene.

With respect to Defendants Otten and MacFarlane, it is undisputed that they were in the basement for Simmons's initial detention, where MacFarlane claims he eventually handcuffed Simmons just after Derouin fell back into the basement from a gunshot wound. Simmons claims that he was dragged out of the

basement of the residence within two minutes of being handcuffed and that, while this was happening, he was aware of the presence of at least five or six officers in the residence. MacFarlane and Otten assert that they were only at the residence for a few minutes after the shooting of Officer Derouin before they left to visit him at the hospital. This testimony is insufficient as a matter of law to establish their entitlement to summary judgment on Simmons's claim that they failed to intervene to stop the use of excessive force against him. *See, e.g., Trepanier,* 2006 WL 1302404, at *15 (denying summary judgment where the plaintiff introduced evidence suggesting that a non-participating officer "was personally in the creek for at least the beginning of the incident and then was nearby" during further alleged excessive force in the creek). Even if both officers remained at the residence for just "a couple minutes" after the shooting, Simmons's testimony is sufficient to avoid summary judgment based on their presence at the residence during the second alleged episode of excessive force, which he claims occurred about two minutes after he was handcuffed.

The Court finds that Defendant Piechocki is hoisted by his own petard for summary judgment purposes. His testimony indicates that he heard Simmons say "I shit on myself" while Simmons was being "escorted" to a police vehicle for transport

to the police station.  Simmons has testified that his "escort" to a police vehicle for transport to the police station involved excessive force.  As such, Piechocki's own testimony could support a reasonable jury finding that he was aware of the excessive use of force and had a realistic opportunity to intervene to prevent it.  As such, Defendants' Motion is denied in relevant part as to Piechocki's failure to intervene.

There is also sufficient evidence to deny Defendants' Motion for Summary Judgment on the supervisory liability claim. For example, in *Smith v. Schield,* a case arising out of an unidentified officers' use of excessive force, the supervisor "did not see the officers actually place handcuffs on plaintiff because he redirected his attention" elsewhere for a short time. *Schield,* 2016 WL 851987 at *3.  However, he remained "only ten feet away from where plaintiff was handcuffed" and heard "the noise attending plaintiff's arrest, including the sound of him hitting the hood of the police car." *Id.*  Similarly, if Piechocki were somehow physically remote from D'Amato's alleged conduct but nonetheless heard Simmons mention soiling himself, it is unclear why Piechocki would not also have heard Simmons being dragged from the basement across the yard and ultimately thrown into the police van.  As such, summary judgment is inappropriate.

Simmons is thus entitled to have a jury hear his case against Defendant Officers for their failure to intervene where he claims that unlawful force was used on him and Defendants' testimony otherwise supports their presence at the moment when some measure of force was indisputably used. *See, Brishke,* 466 F.2d at 10-11. As is often the case where "the excessive force claim against [the officer] is not amenable to summary judgment, the associated failure to intervene claims must go to trial as well." *Abdullahi,* 423 F.3d at 774. Determining the balance of Simmons's excessive force claim is largely a matter of credibility, which the Court cannot resolve on summary judgment. It suffices to note that, if a jury believes Simmons's version of the events surround his removal from the basement and arrest, then a jury could also believe that each of the other Defendant Officers were aware of what D'Amato was doing and spurned a realistic opportunity to intervene.

Although Defendants do not appear to argue for qualified immunity with respect to Simmons's excessive force claim (*see,* Defs.' Mem. at 22-24), the Court finds summary judgment would be inappropriate at this stage anyway. The broadly and hotly contested nature of the wrongful conduct precludes summary judgment, because "one can only speculate how visually obvious any violation" of Simmons's rights might have been. *Abdullahi,*

423 F.3d at 775 (noting that "one or two of the officers . . . had their back[s] to [the arrestee] during the encounter"). In other words, without knowing what D'Amato did or how his conduct appeared – or even whether the other Defendant Officers could see or hear it - it is difficult to say that, as a matter of law, a reasonable officer could not have known that the wrongful conduct violated Simmons's rights. Additional factual development is necessary to determine whether the contested uses of force were "so plainly excessive that a reasonable police officer would have been on notice that such force is violative of the Fourth Amendment." *Chelios v. Heavener,* 520 F.3d 678, 689 (7th Cir. 2008).

Fundamental disputes in the factual record have engendered vastly different accounts of the events that took place in the basement of the residence on March 9, 2014. As such, summary judgment is inappropriate. At trial, the jury will make credibility determinations that will clarify what actions D'Amato took with respect to Simmons, whether the other Defendant Officers failed to intervene, whether Defendant Piechocki bears any supervisory liability for D'Amato's actions, and the reasonableness of these actions or omissions.

### 3. *The City of Chicago*

As explained above in Section III.A.3.c, to avoid summary judgment to the City, Simmons must show that the injury flowing from the use of excessive force can be attributed to an express municipal policy, custom, or decision of one with final policy-making authority for the City. Because there is no evidence in the record that any of the acts comprising Simmons's excessive force claim trace to such a policy or practice of the City, the Court grants summary judgment to the City of Chicago on Simmons's excessive force claim.

## IV.   CONCLUSION

For the reasons stated herein, the Court grants in part and denes in part Defendants' Motion for Partial Summary Judgment [ECF Nos. 85, 93].

Summary judgment is granted to Defendants on the lawfulness of Simmons's handcuffing and initial detention in the basement of the residence. The Court denies summary judgment to all Defendant Officers on Simmons's unlawful and unreasonable arrest at the residence but grants summary judgment to Defendant City of Chicago on this aspect of Simmons's claim.

The Court denies summary judgment to all Defendants on Simmons's unlawful detention claim as it relates to detention at the police station pursuant to his arrest. Further, the Court

denies Defendants' Motion as to Simmons's excessive force claim, except as to Defendant City of Chicago.  It denies Defendants' Motion for Summary Judgment on Simmons's supervisory liability claim.

**IT IS SO ORDERED.**

 

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: February 16, 2017